# ALLEN v. UNITED STATES.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE
WESTERN DISTRICT OF ARKANSAS.

No. 969. Submitted November 16, 1893. — Decided December 4, 1893.

A Statute of Arkansas, Digest of 1884, 425, c. 45, § 1498, provides that " an
infant under twelve years of age shall not be found guilty of any crime
or misdemeanor." The courts of that State have held, *Dove* v. *State*,
37 Arkansas, 261, that the common law presumption that a person be-
tween the ages of twelve and fourteen is incapable of discerning good
from evil, until the contrary be affirmatively shown, still prevails. A
homicide was committed in May. A young person, charged with the com-
mission of it, testified on his trial in the Circuit Court for the Western
District of Arkansas, in the following February, that he would be fifteen
years old the coming March. The court charged the jury that the *prima
facie* presumption as to lack of accountability terminated at eleven years
of age. *Held*, that, although the accused by his testimony had shown
that he had passed the age of fourteen when the crime was committed,
yet, as the mistake might have prejudiced him with the jury, it was
error.

To direct the attention of the jury to the contemplation of the philosophy
of the mental operations, upon which justification, or excuse, or mitiga-
tion in the taking of human life may be predicated, is to hazard the
substitution of abstract conceptions for the actual facts of the particular
case, as they appeared to the defendant at the time.

When the defence, in a case of homicide, is justification, or excuse, or
action in hot blood, the question is one of fact which must be passed
upon by the jury in view of all the circumstances developed in evidence,
uninfluenced by metaphysical considerations proceeding from the
court.

The question whether the defendant in a capital case exceeded the limits
of self-defence, or whether he acted in the heat of passion, is not to be
determined by the deliberation with which a judge expounds the law to a
jury, or with which a jury determines the facts, or with which judgment
is entered and carried into execution.

ALEXANDER ALLEN was indicted at the November term, 1892,
of the Circuit Court for the Western District of Arkansas for
the murder of Phillip Henson in the Cherokee Nation, on May
14, 1892, and, at the February term, 1893, of that court was
tried upon the indictment, found guilty of the crime charged,

and, after the overruling of a motion for new trial, was sentenced to death. A writ of error was then allowed to this court.

The evidence tended to show that Allen was a colored boy, of about fourteen years of age at the time of the homicide, working on the farm of Albert Marks in the Cherokee Nation, some three or four miles from Coffeyville, Kansas, where Marks lived; that on Thursday, May 12, 1892, he was sent to look for some horses belonging to one Morgan, and was accompanied by another colored boy, James Marks, who was then twelve years old; that these boys met Phillip Henson, the deceased, a white boy, eighteen years of age, with whom were George Erne, aged fourteen, and Willie Erne, aged thirteen, also white, and some words ensued between Henson and Allen. In respect of this, the Erne boys testified to nothing of particular moment, but the accused and James Marks testified to great bitterness in the language used by Henson, including threats and oaths. On Saturday, May 14, Henson and the two Erne boys had left the Erne house and were going through a wheat field toward a lake in an easterly direction, carrying in their hands willow sticks with the bark peeled off, with which to kill frogs to use as bait in fishing, and when about half way across the field they saw on the eastern side of the fence which separated it from the land of Albert Marks, Allen, and Harvey Marks, a brother of James, then eleven years of age. An altercation ensued, in which Allen shot Henson with a pistol, from which wound he died in a few minutes. According to the evidence of the Erne boys, Allen took the pistol out of his hip pocket, removed the scabbard, handed it to Harvey Marks, and climbed through the wire fence from the east side to the west side, struck Henson with his left hand, and then with the pistol in his right-hand shot Henson twice and shot George Erne through the arm. Allen and Harvey Marks testified that Henson and his two comrades came through the fence on the west side into Marks' ground, and Henson struck Allen over the head with a stick; that Henson and Allen closed in and wrestled, and Henson threw Allen and had him down, and George Erne then struck Allen on the arm with a

stick; that Allen, while lying on the ground with Henson on him, drew the pistol from his pocket and shot Henson, who, after he was shot, ran towards the fence, about forty steps off, and climbed through it back into the wheat field. His dead body was found lying in the field about thirty or thirty-five steps from the fence. The face seemed bruised, as if he had been struck in the mouth. Evidence was given that the tracks of the three boys were plain and distinct the next day in the soft ground, going in a northeasterly direction in the field towards the lake, and that the wheat was trampled down, and there was blood on the ground at the distance of thirty-eight steps from the fence; that from this point to the fence there was a single track made by shod feet coming over the fence westward, while the other three tracks were made by bare feet; and that Henson and the two Erne boys were barefooted on that occasion, while Allen had on either boots or shoes; that there was short grass on the east side of the fence, and although there were tracks around there it was difficult to discover anything. There was also evidence that Allen, after the shooting, ran back to the house, obtained his satchel, went to Coffeyville in a cart, and thence on foot to Edna, Kansas; that Clifford, the United States marshal for the District of Kansas, and one Knotts found him at Edna about half-past two that day; that he fled, and they pursued and caught him; that Knotts returned with him to Coffeyville, and on the way asked him if he knew that he had killed that boy, and he said, No, that he knew he shot him, but not that he killed him; and then stated that there was a man shot in Oswego, and that nothing was done with him; and being asked what he shot the boy for, he replied he was afraid they would hurt him with their sticks; that they did not strike him with sticks, but he was afraid they would; that they had had trouble a few days before. It further appeared that he told Clifford he " didn't propose to be beaten with clubs; " that the deceased struck him over the arm; and that Clifford examined his person on the 16th and found a bruise on his left arm. The evidence further tended to show that on the morning of the 14th of May, Allen did not have his pistol with him, but, having started with a load of

hay to town, met Harvey Marks coming down to the farm for milk, and was told by William Marks (Harvey's grandfather) to go back with Harvey, which he did, and then went into the farmhouse and took the pistol from his overcoat pocket, where he had placed it two days before. This pistol was found in his satchel when he was arrested, and was a six-shooter with a rubber scabbard on it and one load in it. Three empty cartridge shells, which fitted the pistol, were found in his pocket, and Allen, when asked by Clifford to account for the empty shells, stated that he had emptied his pistol shooting rabbits on his way out there from Coffeyville. When asked on the stand why, when he went to Coffeyville, he had not gone and seen Albert Marks about the matter, and told him what had occurred, or hunted up Mr. Morgan, Allen replied, because he did not think it was worth while; "It wasn't my business, because I had done it, to go around and tell every one about it." James and Harvey Marks were cross-examined to show that there were discrepancies between their statements on the witness stand and statements which they had made to the marshal May 21, and which were taken down in writing by him at the time.

The court in the course of the charge to the jury stated that it was necessary that he should give "the legal definition of all these conditions that I have named, that is, murder, manslaughter, and a rightful killing under the law of self-defence, called a killing in self-defence;" and after defining murder and explaining malice, express and implied, and giving the definition of manslaughter, with comments, all at length, proceeded thus:

"Now, in this connection, if you believe, at the time of this killing, Hanson and these other boys had entered into a fight, had come up and attacked the defendant with sticks, as is claimed by him, and as is claimed by some of these other witnesses, and that he killed him at that time, and under such circumstances, if it was not done in a brutal and unnatural and specially wicked way, that would be a state of case where manslaughter would exist, provided the defendant by his actions of a violent character and his conduct did

not bring on the conflict of that kind. If he brought it on, if he precipitated it by a violent act upon his part, then there could be no mitigation in it; there could be no self-defence, as I will tell you presently. But if, on the other hand, he went up and put his pistol across that fence, and jumped over the fence, and attacked the Hanson boy, struck him in the mouth, and at the same time attempted to shoot him, and subsequently in the consummation of that attempt did shoot him, and followed up that shooting when he was retreating and shot him in the back, that would be a state of case where there would be no manslaughter in it; it would be murder under the definition of that crime as I have given it to you.

"We come now to the other definition. It has been invoked in this case. And I give it in these cases whether it has been invoked or not, because we can frequently reason and come to a conclusion by means of elimination, just as in algebra, you can eliminate certain quantities from a certain side of an equation, and thus get at a certain quantity, and get at a methodical conclusion in a reasonable way in that manner. Now, if we have the definition of these three conditions, and if you can eliminate two of them, you necessarily drop down to the other condition as existing, because there cannot be but one which is true. The conditions are the opposite to each other, and you cannot find the existence of any two of them in a case. There is one certain condition that is applicable to the facts. Therefore, when you have these conditions all before you, you can the better say whether it is murder or manslaughter, or a case of justifiable homicide. [Now, what is justifiable homicide? When can a man slay another? When can he sit as a judge passing upon the law, and a jury passing on the facts, and then as a jury applying the law to those facts, and finding a verdict, and then acting again as the court and entering up judgment, and then going out as a marshal or sheriff and executing that judgment, all at the same time — determining the law, determining the facts as judge, jury, and executioner all at the same time? This is a mighty power in the hands of the citizen. It is a mighty power, yet it is to be applied when

it belongs to him because it is the law of necessity, and it is given to him because it is the law of necessity; it is given to him because at the time he executes it in a deadly way his own life is either actually or really in deadly peril from which he cannot escape, except by the use of that deadly means, or, in your judgment, taking into consideration his condition, there was reasonable ground to believe there was peril. That is what is meant by it. It is a law of protection; it is a law of necessity. This is the law you are sitting here to execute. It is a law of self-defence. You are to execute it for the sake of society, for the protection of the members of society against the acts of violence of the wicked, which would destroy their rights to their property, jeopardize their liberties and destroy their lives. It is all a law of self-defence. The necessity is so great, in contemplation of the law, that the individual can take human life. Now, I will give you this principle of the law as defined by the leading court in this country, and a definition that has never been shaken by any court, and it is stated in very brief language, but there is a great deal in it. There are two propositions; one is a case where the danger to life is actual, is real, at the time of the killing, and that the party cannot escape from it by the exercise of reasonable means, and he therefore, to save his own life, may act, and act to the extent of taking life. I read to you that first proposition, and it is this: 'A man who is in the lawful pursuit of his business' — that means he is doing what he has a right to do, he is doing no wrong, and when in that condition 'he is attacked by another, under circumstances which denote an intention to take away his life or to do him some enormous bodily harm, he may lawfully kill the assailant, provided he use all the means in his power otherwise to save his own life or prevent the intended harm, such as retreating as far as he can, or disabling his adversary without killing him, if it be in his power.' He is doing what he had a right to do, and when so situated he is attacked by another in such a way as to indicate from the nature of the attack a purpose to take away his life; not that he is assaulted in a slight way; you could not kill him for that;

the law of self-defence is a law of proportions as well as a law of necessity, and it is only danger that is deadly in its character that you can exercise a deadly act against. He is attacked by another in such a way as to denote a purpose to take away his life, or to do him some great bodily harm, from which death may follow, and in such a case he may lawfully kill the assailant, when, provided he use all the means in his power otherwise to save his own life or to prevent the intended harm, such as retreating as far as he can or disabling him without killing him, if he be in his power. The act coming from the assailant must be a deadly act under this proposition. It must be an act that is hurled against him, and that he has not created it, or created the necessity for it, and it must be an act of which he cannot avoid the consequences; if he can, he must avoid them; he must get out of the way of the act if he can, rather than take upon himself the responsibility of taking a human life.]

"Now, the other proposition is a case where the danger may not really exist at all; it may not have any existence, but there must be at the time he takes life that which would satisfy a reasonable man, situated as was the defendant, that it did not then and there exist, and a man may act upon its appearance; but there must be an appearance. A man cannot act upon bare suspicion of his own mind; he cannot contemplate a state of case that does not exist. If he has that confronting him which would lead a reasonable man, situated as he was, to the belief that there was deadly danger, he could act upon that condition, and he may kill, provided he cannot avoid what seems to be real danger."

To the giving of that part of the charge included in brackets in the foregoing the defendant at the time excepted.

The court also charged the jury as follows: "Now, a word as to the accountability of this defendant. The law says that when a child between the years of seven and eleven commits a crime he is, presumably, not held accountable, yet this presumption may be overcome by proof; but from eleven years up the law contemplates that he is accountable for his criminal acts; that he is said to be conscious of right and wrong so as

to be held responsible by the law, and to take away that condition it requires the production of proof showing the lack of accountability. In legal contemplation, from eleven years upwards he is accountable." To the giving of this part of the charge the defendant at the time excepted.

An exception was also taken to certain comments of the court in reference to the testimony of the defendant.

Errors were assigned upon the exceptions so taken.

*Mr. A. H. Garland* for plaintiff in error.

*Mr. Assistant Attorney General Conrad* for defendant in error.

MR. CHIEF JUSTICE FULLER, after stating the case, delivered the opinion of the court.

The rule of the common law was that one under the age of seven years could not be guilty of felony or punished for any capital offence, for within that age the infant was conclusively presumed to be incapable of committing the crime; and that while between the ages of seven and fourteen the same presumption obtained, it was only *prima facie* and rebuttable. The maxim — malice supplies the want of maturity of years — was then applied and, upon satisfactory evidence of capacity, the child within these ages might be punished; but no presumption existed in favor of the accused when above fourteen.

The age of irresponsibility has been changed in many of the States by statute, and among others, in Arkansas, where it is provided that "An infant under twelve years of age shall not be found guilty of any crime or misdemeanor," Ark. Stat. Dig. 1884, 425, c. 45, § 1498, it being held, however, that the common law presumption that a person between the ages of twelve and fourteen is incapable of discerning good from evil, until the contrary is affirmatively shown, still prevails. *Dove* v. *State*, 37 Arkansas, 261.

In the case at bar, the defendant testified on the trial, February 13, 1893, that he would be fifteen years old the coming March, and, if this were so, he was fourteen in March, 1892,

and, as the homicide was committed on May 14 of that year, he was at that time some two months older than fourteen years. There seems to have been no controversy over his age, and as to whether his appearance was that of a boy less than fourteen, we have, of course, no means of knowledge. The court was not, so far as this record shows, requested to charge in reference to the age of accountability, and it may be, as suggested, that the matter was adverted to out of consideration for the accused, because immediately after the statement on this subject the learned judge goes on to say that defendant could not be found guilty of any crime unless the jury were satisfied from the whole of the testimony and from the law given to them "that the state of the case which makes the crime is established beyond a reasonable doubt." But this he was bound to charge in any aspect, and the difficulty here is that through some inadvertence the *prima facie* presumption as to lack of accountability was declared to terminate at eleven years instead of fourteen. And while it is properly argued by counsel for the government that this was not an error injurious to the defendant, because on his own statement he had passed the age of fourteen, yet we are not altogether satisfied that the result was not prejudicial. Where the question is whether the homicide was or was not done with malice, wrongfully, intentionally, and without just cause or excuse, it would seem proper that the attention of the jury should be called to the youthfulness of the offender, if the circumstances rendered that fact significant; and since in this case the presumption of the lack of accountability had obtained until within two months of the homicide, if the defendant's own statement as to his age is to be accepted, an instruction which treated him as having been under the weight of full accountability three years longer than was the fact, may have tended to weaken the effect upon the minds of the jurors which his youth might have otherwise had, and to which the humanity of the law regards him as entitled. The burden of proving legal capacity, as of other facts necessary to make out the defendant's guilt, was upon the government; and although the presumption from the defendant's age may have been such as

to sustain that burden, yet, as the court charged in relation to the age of accountability, we are not persuaded that the consequences of want of accuracy ought to be assumed to have been harmless.

We do not care, however, to dispose of the case upon this ground, as another and more serious exception was saved. The contention on the part of the accused was that there was no premeditation on his part; that he was engaged in a fight in which he was struck and thrown down, and, in the heat of the struggle, committed the homicide; that he was entitled to make the defence of excusable homicide, and was guilty at the worst of only manslaughter in unlawfully and wilfully shooting, but without malice. The court deemed it its duty to charge upon the question of justifiable homicide, and in doing so to consider and explain two propositions, one where the danger to life was actual at the time of the killing and the party could not escape from that danger by the exercise of reasonable means, and the other, where the danger might not have really existed at all, but where the appearance of danger was such as would induce a reasonable man to believe that the danger existed. But these two propositions were accompanied by certain observations which form the subject of the exception under consideration. The court said:

"Now, what is justifiable homicide? When can a man slay another? When can he sit as a judge passing upon the law, and a jury passing on the facts, and then as a jury applying the law to those facts, and finding a verdict, and then acting again as a court and entering up judgment, and then going out as a marshal or sheriff and executing that judgment, all at the same time, determining the law, determining the facts, as a judge, jury, and executioner all at the same time? This is a mighty power in the hands of the citizen. It is a mighty power, yet it is to be applied when it belongs to him because it is the law of necessity, and it is given to him because it is the law of necessity; it is given to him because at the time he executes it in a deadly way his own life is either actually or really in deadly peril from which he cannot escape except by the use of that deadly means, or, in your judgment, taking

into consideration his condition, there was reasonable ground to believe there was peril."

It will be perceived that the jury are thus told that he who contends that he slew another to protect his own life from deadly peril, or because he believed his life in immediate danger, must be regarded as exercising the deliberation of a judge in passing upon the law and of a jury in passing upon the facts, in arriving at a determination as to the existence of the danger and the necessity of using the particular, means to avert it, and, having arrived at the conclusion that the taking of life is required, as proceeding to do so as an officer does who is charged by law with the execution of that solemn duty. And inasmuch as the question in such cases frequently is, not only whether there was actually imminent peril to the slayer's life, but whether he entertained an honest belief to that effect upon reasonable grounds, and also whether the killing was in hot blood and attributable to the infirmity of human nature rather than to malice aforethought, the views announced by the learned judge would be applicable to manslaughter as well as excusable homicide, the distinction between which is often extremely close.

In this we are of opinion there was error. To direct the attention of the jury to the contemplation of the philosophy of the mental operations, upon which justification or excuse or mitigation in the taking of human life may be predicated, is to hazard the substitution of abstract conceptions for the actual facts of the particular case as they appeared to the defendant at the time.

While it may be psychologically true that in every sane act, with whatever swiftness performed, there is involved the prior determination to do it, often inappreciably separated in time; yet when the defence in a case of homicide is justification or excuse or action in hot blood, the question is one of fact and must be passed on by the jury in view of all the circumstances developed in evidence, uninfluenced by metaphysical considerations proceeding from the court. In view of such considerations a verdict might be reached in harmony with the results of scholastic reasoning upon the nature of things in general

apart from the subject-matter, and yet be unjustified by the case in the concrete which the jury were impanelled to try.

We do not think that the doctrine is practicable which tests the question whether a defendant exceeded the limits of self-defence or acted in the heat of passion by the deliberation with which a judge expounds the law to a jury or a jury determines the facts, or with which judgment is entered and carried into execution.

This exception is fatal to the verdict, and the judgment must be

*Reversed and the cause remanded with a direction to grant a new trial.*

MR. JUSTICE BREWER, with whom concurred MR. JUSTICE BROWN, dissenting.

I am unable to concur in the conclusions of the court in this case, and will state briefly the grounds of my dissent. From the testimony, an outline of which is given in the opinion, it is evident that if the testimony of the two Erne boys as to the circumstances of the homicide is to be believed, the defendant was guilty of a wilful and deliberate murder; if that of the defendant and the two Marks boys is the truth, then the homicide was probably only manslaughter. That it was this at least is practically conceded. His own counsel say: "We believe, from a full review of this record, that the defendant should have been found guilty of manslaughter; that is the most of which he is guilty." That the testimony of the Erne boys was to be believed rather than that of the defendant is made certain by the testimony of the disinterested parties who examined the ground where the homicide took place, and whose testimony as to the condition of the ground where the body of the deceased was found, and the tracks from that place to the fence, render it morally certain that no such transaction could have taken place as the defendant testified to, and that his testimony, and that of the Marks boys, was false. Of course, we have not here to pass upon this conflicting testimony. I only notice it that it may be seen that the case did

not turn upon any question of the accountability of the defendant; that if the testimony of the Erne boys is to be believed, the homicide was wilful and deliberate, and in revenge for some opprobrious epithets that had been cast upon him two days theretofore by the deceased. There was nothing in the transaction, whether it took place as testified to by the Erne boys or by the defendant and the Marks boys, to suggest any question of the want of accountability. The conduct of the defendant was like that of any other criminal; arming himself with a pistol, going to meet a party against whom he has malice, shooting and killing him, and then endeavoring to make his escape. Strike from the case the testimony as to age, and there is nothing in the story of the homicide, whether as told by the witnesses for the prosecution or those of the defendant, which suggests either youth, immaturity, or mental unsoundness. How can it be that there was any prejudicial error in charging the jury that the age at which accountability was presumed commenced at eleven rather than at fourteen? By his own testimony he was past fourteen. He was thus presumably accountable. If the court had made no reference to the matter, confessedly there would have been no error, and a mistake in the date of the time when accountability commences certainly cannot be vital when it is admitted that accountability existed. Suppose, in a case not capital, the court had instructed that the statute of limitations was ten instead of, as is the fact, three years, and the testimony showed beyond any dispute — the defendant himself admitting it — that the transaction had taken place within the prior year, could it be said that there was error working prejudice to the substantial rights of the defendant and calling for a reversal of the judgment? Yet that is precisely this case. Did this mistake in reference to this irrelevant matter lead the jury to give more credence to the testimony of the Erne boys; to disbelieve the story told by the defendant and his associates? Did it strengthen the testimony of the disinterested parties as to the condition in which they found the place of the homicide and the tracks between that and the fence? Did it in any way change the character of the transaction as presented to

the consideration of the jury? Clearly not, but this court seems to think that the defendant may have looked boyish, and been immature, and that this fact should have been called to the attention of the jury. Yet, if it were true, the jury saw and knew it. So far as the record throws any light upon his appearance, it makes against the idea of boyishness and immaturity. The deceased was a boy eighteen years of age, and his father testifies that the defendant was about his height and much heavier, although he admits that his own boy was short of stature. When he was arrested by the marshal, the latter accosted him thus: "Here, young man, I want you." Of course, this testimony amounts to but little, but so far as it goes it makes against the idea that one who was in appearance and in fact a mere boy was being tried for crime, whose enormity he did not comprehend, and for which he was not fully accountable. It tends to strengthen that which the testimony of the prosecution, evidently entitled to credence, discloses, to wit, deliberate action by one who knew fully what he was about and who was fully responsible therefor. His counsel asked no instruction in respect to his youth or immaturity, and the general rule is that if a party asks no instructions upon a given matter it cannot be held that the court erred in giving none thereon. It seems to me strange to assume that, (while the jury saw the defendant, saw how mature he was, and we only guess at it,) he may have been a mere boy in fact and appearance; that the court should have given an instruction in respect thereto, though none was asked; and that, while he admits that he had arrived at an age of accountability, a mistake in the charge of the court as to the time at which accountability commences is sufficient to work a reversal of the judgment.

With reference to the other matter, which, in the judgment of the court, requires a reversal, it is only another and forcible illustration of that disregard of our rules and the general practice of appellate courts in regard to bills of exception, which I had occasion to comment upon in the opinion I have just filed in the case of *Hicks* v. *United States, ante*, 442, 453. Here is over a page of the court's charge which is challenged

by a general exception without any specification of the matter of law which is objected to. Singularly enough, the matter of law which is the substantial feature of this challenged portion of the charge is not deemed erroneous, is not noticed by this court, but the error which is found is in language of mere illustration in an introductory question. That matter is the law of self-defence, the right to take the life of an assailant to preserve one's own life. And the law stated is that when there is real danger the party assailed may take the life of his assailant. No question is made but that this matter of law was stated correctly. It is, however, held that an error was committed in a question which led up to this statement of the rule of law. The court asks, "When can a man slay another? When can he sit as a judge passing upon the law and a jury passing on the facts, and then as a jury applying the law to those facts and finding a verdict, and then acting again as the court and entering up judgment, and then going out as a marshal or sheriff and executing that judgment, all at the same time — determining the law, determining the facts as judge, jury, and executioner all at the same time?" and because of this question, stated as a preliminary to the laying down of the rule of law, the judgment is set aside. There is in this no charge that there must be a period of long deliberation, such as that which sometimes characterizes proceedings in a court of justice. On the contrary, the plain implication is of speed, for the language is "determining the law, determining the facts as judge, jury, and executioner all at the same time." An instantaneous act. It is psychologically true that a party in exercising the right of self-defence determines what the law is which gives him a right to act, and whether the case before him is within that law, and thus is judge and jury, and then, as marshal or sheriff, carries that determination into immediate execution. It may be conceded that the mental action may be rapid, instantaneous, as it were; that there may be no distinct separation in the thought of the party as to the respective functions of judge and jury, no formal presentation of the law of self-defence with all its limitations; yet of necessity he determines that the situation before him is one which under

the law, as he understands it, gives him a right to take the life of his assailant. He is judge, jury, and sheriff. Indeed, this is not denied, but it is thought that the language used by the court is too metaphysical. In other words, the court has stated what is strictly and accurately true. Yet, because it is abstract and metaphysical, this court will presume that the jury did not understand and might be misled by it. When did it become a rule of law that a court of error should presume that the jury in a trial court were ignorant? When before was it ever heard that a verdict was to be set aside by an appellate court on the ground that a juror may have been misled by an instruction of the trial court, when that instruction it is conceded is strictly accurate and applicable to the case?

For these reasons I dissent, and I am authorized to say that MR. JUSTICE BROWN concurs with me in this dissent.