STATE OF NORTH CAROLINA v. LEWIS THOMAS ROGERS, JR.

No. 20

(Filed 11 July 1969)

**1. Constitutional Law § 29;   Criminal Law § 135;   Jury § 7— exclusion of veniremen opposed to capital punishment**

In this rape prosecution, statement in the record that the State inquired of each prospective juror as to whether he believed in capital punishment is insufficient to support an assignment of error to failure of the court to quash the indictment on the ground that prospective jurors opposed to capital punishment were challenged for cause.

**2. Jury § 6—   examination of veniremen as to views on capital punishment**

It is not error to ask a prospective juror whether he believes in capital punishment.

**3. Criminal Law § 161—   necessity for exceptions**

Only assignments of error based on exceptions duly taken are consid-

'ered, and questions not embraced in an exception duly taken at the trial may not be presented on appeal.

**4. Grand Jury § 3— motion to quash — systematic exclusion of Negroes — sufficiency of evidence**

In this rape prosecution, the trial court did not err in the denial of defendant's motion to quash the indictment on the ground that Negroes were systematically excluded from the grand jury which indicted him, where the only evidence in support of the motion is a transcript of testimony presented upon the same motion in another case, there being no evidence that the grand juries in the two cases were the same, and the question of systematic exclusion having been decided adversely to defendant upon appeal of the other case to the Supreme Court.

**5. Indictment and Warrant § 14— motion to quash — systematic exclusion of Negroes from administration of court system**

Defendant's motion to quash the indictment on the ground that Negroes are systematically excluded from the administration of the court system is properly denied where defendant's evidence shows only that for 34 years no Negro has served as judge, solicitor or reporter in the superior court of the county, there being no evidence in the record that any Negro has sought such positions, or any other administrative position, in the court system of the county and been denied on account of race.

**6. Judges § 1; Solicitors— election of judges and solicitors — appointment of court reporters**

Superior court judges are elected by the people of the State and solicitors by the voters of the solicitorial districts, G.S. 7-41, G.S. 7-43, N. C. Const. Art. IV, §§ 7, 16; court reporters are appointed in each judicial district by the senior regular resident superior court judge. G.S. 7A-95(e).

**7. Constitutional Law § 36— cruel and unusual punishment**

Cruel or unusual punishments are prohibited by Article I, § 14 of the Constitution of North Carolina and by the Eighth Amendment to the Constitution of the United States which is now applicable to the several states.

**8. Constitutional Law § 36— cruel and unusual punishment — expert opinion evidence**

What constitutes cruel or unusual punishment is a question of law for the court and is not subject to proof by expert opinion evidence.

**9. Constitutional Law § 36— cruel and unusual punishment**

Punishment which does not exceed the limits fixed by statute cannot be classified as cruel and unusual in a constitutional sense unless the punishment provisions of the statute itself are unconstitutional.

**10. Constitutional Law § 36; Criminal Law § 135; Rape § 7— death penalty for rape**

Imposition of the death penalty upon conviction of the crime of rape is not unconstitutional *per se.*

**11. Constitutional Law § 36;   Criminal Law §§ 50, 135— death penalty — cruel and unusual punishment — expert opinion testimony**

In this prosecution for rape, the trial court did not err in refusing to allow a witness to give his "expert opinion" that the death penalty constitutes cruel and unusual punishment and to support his opinion by quotations from leading authors in the field of criminology and penology, such testimony being irrelevant since the determination of what constitutes cruel and unusual punishment is a question of law for the court.

**12. Indictment and Warrant § 14;   Criminal Law § 135;   Constitutional Law § 20— motion to quash — death penalty — discrimination against Negroes**

In this prosecution for rape, the trial court did not err in the denial of defendant's motion to quash the bill of indictment on the ground the death penalty is used in a discriminatory manner against Negroes, thereby depriving defendant of equal protection of the law in violation of the Fourteenth Amendment, where defendant's evidence is merely a collection of statistics to the effect that since 1910 more Negroes than whites have been sentenced to death and executed in this State for the crime of rape and for all capital crimes, the motion as well as the evidence supporting it being irrelevant to the validity of the bill of indictment.

**13. Jury § 5;   Grand Jury § 1— jury list taken only from tax records**

The fact that the county commissioners used only the names on the tax records in making up the jury list and jury box from which the grand and petit juries were chosen and did not also use "a list of names of persons who do not appear on the tax lists" as directed by G.S. 9-1 does not show racial discrimination in the selection of prospective jurors.

**14. Jury § 3— qualifications for jurors**

Absent discrimination by race or other identifiable group or class, a State is at liberty to prescribe such qualifications for jurors as it deems proper without offending the Fourteenth Amendment.

**15. Indictment and Warrant § 2;   Grand Jury §§ 1, 3— grand jurors chosen only from tax list — validity of indictment**

Failure of county commissioners to include as source material for the jury list not only the tax records but also "a list of names of persons who do not appear upon the tax lists" as authorized by G.S. 9-1 does not void a bill of indictment returned by a grand jury drawn from a jury box so composed, the provisions of the statute being directory and not mandatory.

**16. Jury § 5;   Grand Jury § 1;   Constitutional Law § 29— jury list containing only names of property owners**

The use of a jury box containing only the names of property owners is not *per se* discriminatory as to race and does not unfairly narrow the choice of jurors so as to impinge defendant's statutory or constitutional rights.

**17. Criminal Law § 32— capacity of infants to commit crime — common law presumptions**

At common law, infants under seven years of age were conclusively

presumed incapable of crime, between ages seven and fourteen rebuttably presumed incapable, and those over fourteen were presumptively capable; in case of rape, the common law presumption of incapacity was conclusive to age fourteen.

**18. Criminal Law § 32— infants 14 years old and over — capacity to commit crime — presumptions**

Unless otherwise provided by statute, infants of the age of fourteen and over are not entitled to any presumption of incapacity.

**19. Courts § 15— 14 year old minor charged with capital felony — jurisdiction of juvenile court and superior court**

The juvenile department of the superior court is without jurisdiction where the charge is a capital felony and the offender is fourteen years of age and over, such offender being subject to indictment and trial in the superior court. G.S. 110-21 et seq.

**20. Criminal Law § 5— low mentality — defense to crime**

Low mentality in itself is no defense to a criminal charge, and the exclusion of evidence of low mentality is not error.

**21. Criminal Law § 5— test of criminal responsibility**

The test of accountability does not depend on intelligence, education or general mental capacity.

**22. Criminal Law § 5— test of mental responsibility**

The true test of mental responsibility in this State is whether defendant has the ability to distinguish right from wrong at the time and with respect to the matter under consideration.

**23. Indictment and Warrant § 14; Criminal Law §§ 5, 13— motion to quash — 14 year old boy charged with rape — low mentality**

In this prosecution for rape, the trial court did not err in the denial of defendant's motion to quash the indictment on the ground that he was only 14 years of age at the time of the alleged crime and had an I.Q. of only 63.

**24. Constitutional Law § 32; Criminal Law § 66— lineup identification — right to counsel**

United States Supreme Court decisions relating to the right of an accused to be represented by counsel at a lineup are inapplicable to a case in which the lineup occurred prior to June 12, 1967, the date of those decisions.

**25. Constitutional Law § 30; Criminal Law § 66— lineup procedure — totality of circumstances test — due process**

Judged by the totality of the circumstances, the conduct of identification procedures at a police lineup may be so unnecessarily suggestive and conducive to irreparable mistaken identification as to constitute a denial of due process, thus rendering inadmissible evidence that a witness identified the accused at the lineup or any in-court identification by witnesses who viewed the lineup unless the State shows on *voir dire* that the in-court

identification is of independent origin and not the result of the illegal out-of-court confrontation.

**26. Constitutional Law § 30;   Criminal Law § 66— lineup procedure — totality of circumstances — due process**

In this rape prosecution wherein the victim had informed police that her assailant had a men's leather belt hanging around his neck during the assault, lineup confrontation at which defendant was the only participant who had a belt hanging around his neck was not unnecessarily suggestive so as to violate due process, where the belt was worn voluntarily by defendant at the time of his arrest and during the lineup and its presence cannot be attributed to the officers, and where prosecutrix gave police a detailed description of her assailant which fits the actual appearance of defendant, prosecutrix showed no hesitancy in her identification of defendant, the lineup occurred only some 24 hours after the crime and the other lineup participants physically resembled defendant.

**27. Criminal Law § 42— clothing worn by rape victim — admissibility**

In this prosecution for rape, articles of clothing identified as worn by the victim at the time the crime was committed are properly admitted into evidence.

**28. Constitutional Law §§ 21, 33;   Criminal Law §§ 42, 84— clothing taken from defendant for analysis**

In this rape prosecution, no right of defendant, constitutional or otherwise, was violated when a police officer required him to surrender for examination and analysis the pants worn by him at the time of his arrest, and the pants are competent to be admitted into evidence.

**29. Criminal Law § 169— objection to admission of evidence — like evidence thereafter admitted without objection**

In this rape prosecution, objection to testimony as to identification of shoes allegedly worn by defendant on the night of the crime is waived where testimony of the same import was thereafter admitted without objection.

APPEAL by defendant from *Bailey, J.,* at the August 28, 1967, Criminal Session, DURHAM Superior Court.

Criminal prosecution upon a bill of indictment charging defendant with the crime of rape on Mrs. Edna Meachum. The jury returned a verdict of guilty as charged with a recommendation of life imprisonment. From judgment in accordance therewith defendant gave notice of appeal to the Supreme Court. M. C. Burt, Jr., his court-appointed counsel, neglected to perfect said appeal and, after reprimand, was removed as counsel and Attorney W. P. Whichard was appointed in his stead. Petition for certiorari to the Superior Court of Durham County as a substitute for appeal under Rule 34, Rules of Practice in the Supreme Court, was thereupon filed on be-

half of defendant and allowed by order of this Court in conference on 11 February 1969.

The State's evidence tends to show that Mrs. Edna Meachum, twenty-nine years old, lives with her mother at 826 N. Mangum Street in Durham. On January 14, 1967, she left home at 7:30 p.m., going uptown to meet a girl friend and then to the movies. She was wearing a skirt and blouse, low-heeled shoes, and an all-weather coat. As she walked up Mangum Street, she saw three colored boys walking toward her. Before reaching her they turned and began walking in the same direction she was going. Two walked very slowly and the third ran on ahead. Mrs. Meachum began walking faster so as to pass the two in front of the Curb Market where people were standing. She crossed Hunt Street walking fast. Just as she reached the other side of the S & H Green Stamp Store she heard something hit the sidewalk, turned to look and saw her assailant standing behind her. She had never seen him before and did not know his name. As she turned to look he put his left arm around her neck. She asked him what he wanted and he replied, "You know what I want." He started dragging her backwards across the parking lot. She began screaming and he struck her on the head two or three times with his fist and said, "I am going to kill you if you don't quit screaming." He had a belt around his neck and she was afraid he might use it to choke her. When he got to the rear of the store building he told her he had a gun and was going to kill her. He said, "I am going to get what I want and then I am going to kill you," and she kept crying and begging him to let her go. There was no one else in the vicinity. The Stamp Store was closed at that time. There was a street lamp at the front of the store but it was dark behind the building.

Mrs. Meachum lost her balance while being forced backwards. Her foot caught on a rock at the rear of the store and she fell over backwards on muddy ground with her assailant on top of her. He kept telling her to be quiet, to shut up, that he was going to kill her. He had sexual relations with her forcibly and against her will. While still on top of her he demanded her money. She removed $3.00 — all she had — from her pocketbook and gave it to him. He then got up, ran to the bottom of the bank and stood there looking back at her. Mrs. Meachum arose quickly, found her shoes which were lost in the scuffle, and ran around to the parking lot. She then ran up the street to the police department and reported the incident. Her coat was muddy, her hair and clothing wet. She told the police her assailant was a young colored male with smooth skin, hair cut short, dressed in a dark blue jacket and dark pants and had a men's leather belt looped loosely and hanging around his neck.

The following day, January 15, 1967, at about 7:00 p.m., Mrs. Meachum returned to the police station on request to view four young colored boys, including defendant. One boy was taller than the defendant. The other two were about his size. One had on a dark navy blue jacket and a pair of dark trousers. One was wearing a dark sweater. Defendant was dressed in a shirt and dungaree-type pants, which made him look a little different, and had a belt hanging around his neck. Mrs. Meachum viewed the four boys through a two-way glass window and identified defendant as the person who had raped her the previous evening.

After conducting a voir dire in the absence of the jury, during which evidence for both the State and the defendant was heard, including Dr. Bruce Kyles' report set out in the next paragraph, the trial judge found that the lineup was fairly and legally conducted and the evidence relating to defendant's identification admissible. Mrs. Meachum then identified defendant in court before the jury as noted in the opinion.

Pending trial, on motion of court-appointed counsel, defendant was committed to Cherry Hospital at Goldsboro for a 60-day observation period. The clinical summary describes defendant as an alert, pleasant lad oriented in all areas with an I.Q. of 59 — moderate mental deficiency. This summary further reveals that from October 1962 to April 1966 — or from age 11 to 14 — defendant had been arrested nine times for such things as store breaking, taking money, taking merchandise, and assault and battery. Defendant reluctantly admitted this history after initially stating that the present rape case was the only trouble he had ever had with the law. The diagnosis is "mental deficiency, moderate degree, with behavioral disturbance, code #6113." Dr. Kyles thereupon returned defendant to court as able to stand trial, stating, "It is the carefully considered opinion of the medical staff at Cherry Hospital that Lewis Thomas Rogers, Jr., is able to plead to the bill of indictment against him. He knows right from wrong, is aware of the nature and probable consequences of the offense with which he is charged, and in our opinion is able to consult with counsel in the preparation of his defense."

Dr. Norman Bowles did a pelvic examination on Mrs. Meachum on the evening of January 14, in the Emergency Department at Watts Hospital. A wet smear from the vagina showed the presence of live male sperm. Mrs. Meachum had mud in her hair and on her shoulder and an abrasion on the right shoulder. She was upset and was admitted to the hospital until the following day.

William S. Best, a chemist with the SBI for twelve years, re-

ceived Mrs. Meachum's coat and defendant's shoes from Officer Hicks, and took them to Dr. Buol at the Soil Science Department at North Carolina State University. He later received them back from Dr. Buol and returned them to Officer Hicks. They were offered and allowed in evidence over defendant's objection.

Dr. Stanley W. Buol, an expert in the field of soil analysis and soil science, testified without objection that three soil samples — one from the coat and one from each shoe — were carbon copies of each other and, in his opinion, certainly came from the same site.

Evidence for the defendant: Leo Kimball testified that between 7:00 and 7:30 p.m. on Saturday night, January 14, 1967, he picked defendant up at the corner of Canal and Roxboro Streets in Durham, drove to the corner of Roxboro and Dowd Streets where he picked up Sammy Melvin and James Green, and then drove to a clubhouse on Todd Street in Millgrove; that the four of them remained at said club until 11:00 p.m., when he drove back to North Durham and put defendant off on the corner of Canal and Roxboro. Evidence to the same effect was given by James Green and Samuel Melvin. These three witnesses each denied being a member of a gang known as the "Hunt Street Angels." Green and Melvin stated they had heard of the group but did not belong to it. Melvin stated that some of the "Hunt Street Angels" wore belts around their necks at times; that he had seen them walking two at a time with belts around their necks; and that he had seen defendant wear a belt around his neck although defendant did not have a belt there on the night they went to the club on Todd Street.

Defendant offered a certificate of his birth showing birthdate of February 2, 1952.

Mrs. Miriam Clifford, a school psychologist employed by the Education Improvement Program of Duke University, testified that she works primarily with the public schools; that she did a mental and intelligence examination on defendant at the request of his mother in June 1966; that defendant made a score indicating an I.Q. of 63, which places him in the lowest two percent of the population; that his I.Q. will not likely improve with age; that the tests she gave have nothing directly to do with whether defendant is sane or not sane; that she saw no evidence of mental illness and has no evidence at all on whether he knew right from wrong because she has no way of making a judgment.

Defendant did not testify in his own behalf.

Officer McCrea, in rebuttal, testified that the witness Sammy

Melvin told him that on Saturday night, the 14th of January, he, the defendant, and Melvin's brother had been to the West End and had walked back to Hunt Street; that the three of them then parted and Lewis Rogers went back in the direction of the City of Durham, going south on Mangum Street, and that he never saw defendant any more that night; that it was about 7:00 or 7:30 p.m. when he and defendant parted there on Mangum Street.

Other evidence pertinent to discussion of the various assignments of error is, to avoid repetition, omitted here and will be noted in the opinion.

*Willis P. Whichard, Attorney for defendant appellant.*

*Robert Morgan, Attorney General, and Ralph Moody, Deputy Attorney General, for the State.*

HUSKINS, J.

**[1-3]** Defendant moved to quash the bill of indictment on the ground that jurors opposed to capital punishment were challenged for cause, asserting that it was error to permit individual jurors to be questioned as to their belief in capital punishment. The record contains the following entry with respect to selection of the jury: "Immediately prior to the presentation of the State's evidence, the jury was duly selected as required by law. During the interrogation of the individual jurors the State inquired of each juror: 'Do you believe in capital punishment in certain cases as provided by law?' " No objection was made and no exception taken to the *manner* in which the jury was selected. The record fails to show how many prospective jurors, if any, were excused for cause — any cause. It is not error to ask a prospective juror whether he believes in capital punishment. *State v. Atkinson,* 275 N.C. 288, 167 S.E. 2d 241. Even *Witherspoon v. Illinois,* 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770, does not prohibit the question. This assignment has nothing of record to support it. Only assignments of error based on exceptions duly taken are considered. *Langley v. Langley,* 268 N.C. 415, 150 S.E. 2d 764; *State v. Ferebee,* 266 N.C. 606, 146 S.E. 2d 666; *State v. Mallory,* 266 N.C. 31, 145 S.E. 2d 335, cert. den., 384 U.S. 928, 16 L. Ed. 2d 531, 86 S. Ct. 1443. Questions not embraced in an exception duly taken at the trial may not be presented on appeal. *Wilson v. Wilson,* 263 N.C. 88, 138 S.E. 2d 827; *Freight Lines v. Burlington Mills and Brooks v. Burlington Mills,* 246 N.C. 143, 97 S.E. 2d 850; *Terrace, Inc. v. Indemnity Co.,* 241 N.C. 473, 85 S.E. 2d 677.

**[4]** Defendant moved to quash the bill of indictment on the ground

that Negroes were systematically excluded from the grand jury which indicted him. In support of the motion, the court reporter at defendant's request read into the record in this case the testimony of J. M. Mangum and Murray Upchurch taken April 10, 1967, before Judge Carr in another case entitled *"State v. Edward Theodore Ray,"* the same motion having been made in that case. There is no further evidence in this record to support this motion. At the conclusion of the reading of the evidence of these two witnesses, the motion was denied and defendant assigns this ruling of the court as error.

This assignment has no merit. There is no evidence to show that the grand jury in the *Ray* case and the grand jury which returned the bill of indictment in this case were one and the same. If we assume the same grand jury acted in both cases, the question of systematic exclusion of Negroes' from said grand jury was fully considered in *State v. Ray,* 274 N.C. 556, 164 S.E. 2d 457, and decided adversely to defendant. The assignment is therefore overruled.

[5, 6] Defendant moved to quash the bill of indictment on the ground that Negroes are systematically excluded from the administration of the court system. In support of the motion he examined Sheriff J. M. Mangum who testified that for thirty-four years no Negro superior court judge has presided over Durham County Superior Court; that no Negro solicitor has prosecuted the criminal docket; and that no Negro court reporter has served in said court. Defendant contends this deprived him of a fair trial but offers no specifics in that respect.

Superior court judges in North Carolina are elected by the people of the State and solicitors by the voters of the solicitorial district. G.S. 7-41; G.S. 7-43; N. C. Const. art. IV, secs. 7, 16. Court reporters are appointed in each judicial district by the senior regular resident superior court judge. G.S. 7A-95(e). Eligible persons of all races may be candidates or applicants for these positions. There is no evidence in the record that any Negro has sought these positions, or any other administrative position, in the court system of Durham County and been denied on account of race. This assignment is devoid of merit and therefore overruled.

[11] Defendant sought to elicit from V. L. Bounds, Director of Prisons for North Carolina, his "expert opinion" that the death penalty constitutes cruel and unusual punishment and to support his opinion by quotations from leading authors in the field of criminology and penology. The Court refused to allow it and held that the death penalty is not cruel and unusual punishment per se. Defendant asserts error.

[7]     Cruel or unusual punishments are prohibited by Article I, Section 14, of the Constitution of North Carolina and by the Eighth Amendment to the Constitution of the United States which is now applicable to the several states. *Robinson v. California,* 370 U.S. 660, 8 L. Ed. 2d 758, 82 S. Ct. 1417, reh. den. 371 U.S. 905, 9 L. Ed. 2d 166, 83 S. Ct. 202.

[8, 9]     What constitutes cruel and unusual punishment is a question of law for the court and not subject to proof by expert opinion evidence. When punishment does not exceed the limits fixed by statute it cannot be classified as cruel and unusual in a constitutional sense (*State v. Davis,* 267 N.C. 126, 147 S.E. 2d 570; *State v. Bruce,* 268 N.C. 174, 150 S.E. 2d 216; *State v. Greer,* 270 N.C. 143, 153 S.E. 2d 849), unless the punishment provisions of the statute itself are unconstitutional. *State v. Bruce, supra; State v. Robinson,* 271 N.C. 448, 156 S.E. 2d 854.

[10]     G.S. 14-21 in pertinent part provides that "[e]very person who is convicted of ravishing and carnally knowing any female of the age of twelve years or more by force and against her will . . . shall suffer death: Provided, if the jury shall so recommend at the time of rendering its verdict in open court, the punishment shall be imprisonment for life in the State's prison, and the court shall so instruct the jury." Here, the jury so recommended and defendant was sentenced to life imprisonment. The sentence does not exceed the limit fixed by statute. The death penalty, or its alternative when the jury so recommends, is not prohibited as cruel and unusual in the constitutional sense, and its imposition upon conviction of the crime of rape is not unconstitutional per se. *State v. Yoes and Hale v. State,* 271 N.C. 616, 157 S.E. 2d 386.

[11]     In *Trop v. Dulles,* 356 U.S. 86, 2 L. Ed. 2d 630, 78 S. Ct. 590, the Supreme Court of the United States said: "Whatever the arguments may be against capital punishment, both on moral grounds and in terms of accomplishing the purposes of punishment — and they are forceful — the death penalty has been employed throughout our history, and, in a day when it is still widely accepted, it cannot be said to violate the constitutional concept of cruelty." It follows that an expert opinion and quotations from authors on criminology and penology are completely irrelevant. This assignment is overruled.

[12]     Defendant moved to quash the bill on the ground the death penalty is used in a discriminatory manner against Negroes thereby depriving defendant of the equal protection of the law in violation of the Fourteenth Amendment. In support of this motion defendant

elicited from J. D. Wilson, Supervisor of Consolidated Records Section, State Prison Department, testimony to the effect that in North Carolina 110 Negroes and 17 whites have been sentenced to death for the crime of rape since 1910; that 66 Negroes and 5 whites have been executed; that the death sentence of 38 Negro and 9 white defendants were commuted to life imprisonment; that 66% of all Negroes and 33% of all whites sentenced to death for rape are executed; that since 1910 the total number of executions for all capital crimes in North Carolina is as follows: 73 white males, 282 Negro males, 2 Negro females and 5 Indian males, for a total of 362; that aside from the report which the witness read, he doesn't know how many Negroes and whites have been convicted for rape and life sentences imposed; that the report deals only with death sentences; that he has no figures revealing the number of rapes committed by Negroes as compared to the number committed by whites, but according to the report from which the figures are taken, many more rapes were committed by Negroes than by members of the white race.

The foregoing evidence is wholly ineffective on the question posed by this motion. It is merely a collection of statistics and nothing more. The motion itself is a *non sequitur*. Its fallacious rationale seems to be that since a certain percentage of white criminals commit rape and go unpunished it invalidates the law against rape and licenses a proportionate number of Negroes in that field. The motion as well as the evidence supporting it is totally irrelevant to the validity of the bill of indictment.

Defendant's motion to quash the bill of indictment on the ground that non-property owners were systematically excluded from the jury list in Durham County was denied, and defendant assigns same as error.

Artical I, Section 13, of the Constitution of North Carolina requires "a jury of good and lawful persons." The Sixth Amendment to the Constitution of the United States specifies a right to trial "by an impartial jury." And the Fourteenth Amendment provides that no State shall deprive any person of his life, liberty or property "without due process of law."

[13-15] The record shows that the County Commissioners of Durham County used only the names on the tax records in making up the jury list and the jury box from which was drawn the grand jury and petit jury in this case. The fact that the commissioners did not also use "a list of names of persons who do not appear on the tax lists" as directed by G.S. 9-1 does not show racial discrimination in the selection of prospective jurors. *State v. Brown*, 233 N.C. 202, 63

S.E. 2d 99. Absent discrimination by race or other identifiable group or class, a State is at liberty to prescribe such qualifications for jurors as it deems proper without offending the Fourteenth Amendment. *Miller v. State,* 237 N.C. 29, 74 S.E. 2d 513; *State v. Knight,* 269 N.C. 100, 152 S.E. 2d 179; *Eubanks v. Louisiana,* 356 U.S. 584, 2 L. Ed. 2d 991, 78 S. Ct. 970. Prior to 1947, G.S. 9-1 provided that the tax returns of the county for the preceding year should constitute the source from which the jury list should be taken. No other source was prescribed. When women became eligible to serve on juries by adoption of a constitutional amendment the previous year, the statute was amended to include as source material not only the tax returns but also "a list of names of persons who do not appear upon the tax lists, who are residents of the county and over twenty-one years of age. . . ." Chapter 1007, Session Laws of 1947; *State v. Brown, supra* (233 N.C. 202, 63 S.E. 2d 99). Failure to use this additional authorized list, however, does not affect the legality of the jury. The provisions of the statute in that respect are directory and not mandatory in the absence of bad faith or corruption, and neither is suggested here. *State v. Yoes and Hale v. State, supra* (271 N.C. 616, 157 S.E. 2d 386); *State v. Brown, supra; State v. Mallard,* 184 N.C. 667, 114 S.E. 17, and cases there cited. Hence, noncompliance with a procedure merely directory for the preparation of the jury list does not void a bill of indictment returned by a grand jury drawn from a jury box so composed. *State v. Yoes and Hale v. State, supra.*

[16]  We adhere to precedent long established in this State and hold that use of a jury box containing only the names of property owners was not per se discriminatory as to race and did not unfairly narrow the choice of jurors so as to impinge defendant's statutory or constitutional rights. *Brown v. Allen,* 344 U.S. 443, 97 L. Ed. 469, 73 S. Ct. 397. This assignment of error is therefore overruled.

[23]  Defendant moved to quash the bill of indictment on the ground that he was only fourteen years of age at the time of the alleged crime and had an I.Q. of 63. Denial of the motion is assigned as error.

In support of the motion defendant offered his birth certificate which showed he was born February 2, 1952, and thus was fourteen years, eleven months and twelve days of age on January 14, 1967 — the date Mrs. Meachum was allegedly raped. He also offered the testimony of Mrs. Miriam Clifford, a school psychologist, to the effect that he had an I.Q. of 63 which placed him in the lowest 2% of the population.

[17]   At common law, infants under seven years of age were conclusively presumed incapable of crime, between ages seven and fourteen rebuttably presumed incapable, and those over fourteen were presumptively capable. 21 Am. Jur. 2d, Criminal Law, Sec. 27; *Allen v. United States,* 150 U.S. 551, 37 L. Ed. 1179, 14 S. Ct. 196; *State v. Yeargan,* 117 N.C. 706, 23 S.E. 153. In cases of rape, the common law presumption of incapacity was conclusive to age fourteen. "In England, it was accepted as a fact that a child under fourteen had not the physical capacity to commit the offense, and it was therefore held from an early day that the presumption of incapacity was conclusive, and this rule prevails in a few jurisdictions in the United States. In most of the states, however, on account of the great diversity of climate, race, habit, and the condition in life, which largely influence the physical condition and affect development, the rule adopted is that while there is a presumption of physical incapacity as to all boys under the age of fourteen, this is merely a prima facie presumption, subject to be rebutted by proof. It is well known that in some portions of this country instances of puberty among boys under fourteen years are not uncommon, and to adopt the rule which exists in countries where the climate, condition, and habits of the people are different, and the population mostly of one race, would be a departure from reason and good sense, and would afford immunity to a large number of persons capable of committing rape, or who have actually committed it, and thus in many instances defeat the ends of justice." 44 Am. Jur., Rape, Sec. 31; *Gordon v. State,* 93 Ga. 531, 21 S.E. 54.

[18]   Unless otherwise provided by statute, infants of the age of fourteen and over are not entitled to any presumption of incapacity. *Allen v. United States, supra.* They are presumed capable of crime and are practically adults in the eyes of the law. *Colley v. State,* 179 Tenn. 651, 169 S.W. 2d 848, cert. den. 320 U.S. 766, 88 L. Ed. 457, 64 S. Ct. 71; *Cochran v. Peeler,* 209 Miss. 394, 47 So. 2d 806; *Clay v. State,* 143 Fla. 204, 196 So. 462 (holding that one could be convicted and executed for murder committed at age fourteen); *State v. Smith,* 213 N.C. 299, 195 S.E. 819.

[19]   The juvenile court, as a separate part of the superior court, was established by Chapter 97, Session Laws of 1919, now codified as G.S. 110-21, et seq. Construing the provisions of those statutes in *State v. Burnett,* 179 N.C. 735, 102 S.E. 711, it was held that: (1) a child under fourteen years of age is no longer indictable as a criminal but must be dealt with as a ward of the State; (2) a child between fourteen and sixteen years of age, and as to felonies when the punishment cannot exceed ten years, may, if the case be of a nature

to require it, be bound over to the next term of the superior court to be prosecuted under the criminal law pertaining to the charge; and (3) a child fourteen years of age and over, in case of felonies in which the punishment may be more than ten years, is in all instances subject to prosecution as in case of adults. Thus where the charge is a capital felony, as here, the juvenile department of the superior court is without jurisdiction, and the offender, fourteen years of age and over is subject to indictment and trial in the superior court. See *State v. Smith,* 213 N.C. 299, 195 S.E. 819, where the defendant, slightly over fifteen years of age, was tried and convicted in the superior court for the crime of rape and his sentence of death upheld.

[20-23]    It has been held that low mentality in itself is no defense to a criminal charge. *State v. Jackson,* 346 Mo. 474, 142 S.W. 2d 45. Evidence of low mentality is irrelevant and its exclusion is not error. *State v. Jenkins,* 208 N.C. 740, 182 S.E. 324; *State v. Scales,* 242 N.C. 400, 87 S.E. 2d 916. The test of accountability does not depend on intelligence, education, or general mental capacity. *Young v. State,* Fla., 140 So. 2d 97 (evidence that defendant had very low I.Q. was excluded as immaterial). The true test of mental responsibility in North Carolina and in a majority of American jurisdictions is whether defendant has the ability to distinguish right from wrong at the time and with respect to the matter under investigation. *State v. Willis,* 255 N.C. 473, 121 S.E. 2d 854; *State v. Scales, supra; State v. Grayson,* 239 N.C. 453, 80 S.E. 2d 387; *Leland v. Oregon,* 343 U.S. 790, 96 L. Ed. 1302, 72 S. Ct. 1002, reh. den. 344 U.S. 848, 97 L. Ed. 659, 73 S. Ct. 4. Measured by these principles, this assignment has no merit and is overruled.

Defendant assigns as error the admission of evidence regarding his in-custody lineup identification.

[24]    The rules established for in-custody lineup identification by *United States v. Wade,* 388 U.S. 218, 18 L. Ed. 2d 1149, 87 S. Ct. 1926, and *Gilbert v. California,* 388 U.S. 263, 18 L. Ed. 2d 1178, 87 S. Ct. 1951 (both decided June 12, 1967), include the constitutional right to the presence of counsel at the lineup and, when counsel is not present, (1) render inadmissible the testimony of witnesses that they had identified the accused at the lineup, and (2) render inadmissible the in-court identification of the accused by a lineup witness unless it is first determined on voir dire that the in-court identification is of independent origin and thus not tainted by the illegal lineup. *State v. Wright,* 274 N.C. 84, 161 S.E. 2d 581. *Wade* and *Gilbert* do not apply retroactively, however, and affect only cases

involving lineups for identification purposes conducted after June 12, 1967. *Stovall v. Denno,* 388 U.S. 293, 18 L. Ed. 2d 1199, 87 S. Ct. 1967.

The lineup in this case was conducted on January 15, 1967. Hence the rules established by *Wade* and *Gilbert* do not apply. Even so, *Stovall* states that the totality of circumstances may show the use of lineup procedures "so unnecessarily suggestive and conducive to irreparable mistaken identification" as to be a denial of due process of law under the Fourteenth Amendment. Defendant contends he was the victim of such a suggestive lineup procedure.

[25]    The Fourteenth Amendment declares that no State shall "deprive any person of life, liberty, or property, without due process of law. . . ." Since *Mapp v. Ohio,* 367 U.S. 643, 6 L. Ed. 2d 1081, 81 S. Ct. 1684 (1961), "[e]vidence unconstitutionally obtained is excluded in both state and federal courts as an essential to due process — not as a rule of evidence but as a matter of constitutional law." *State v. Colson,* 274 N.C. 295, 306, 163 S.E. 2d 376, 384. With respect to lineups, the test of due process prior to *Stovall* was whether the procedures employed offended fundamental standards of decency, fairness, and justice. *Rochin v. California,* 342 U.S. 165, 96 L. Ed. 183, 72 S. Ct. 205, 25 A.L.R. 2d 1396 (1952). This is still the test enlarged only by the right to presence of counsel at the lineup. If a consideration of the total circumstances reveals pretrial identification procedures unnecessarily suggestive and conducive to irreparable mistaken identification, such procedures would manifestly offend fundamental standards of decency, fairness and justice and amount to a denial of due process of law. Was the lineup in this case conducted in such fashion? If so, evidence that the witness identified the accused at the lineup is evidence illegally obtained and thus inadmissible as a matter of constitutional law. *Foster v. California,* 394 U.S. 440, 22 L. Ed. 2d 402, 89 S. Ct. 1127 (decided April 1, 1969). Furthermore, in-court identification by witnesses who view such a lineup must be excluded unless the State shows on voir dire that the in-court identification is of independent origin and not the result of the illegal out-of-court confrontation. *United States v. Wade, supra; State v. Wright, supra.*

[26]    Let us look at the evidence. At the police station on the night of January 14 following the attack upon her, Mrs. Meachum told the officers her assailant was a young colored male with very smooth skin who did not need a shave, dark skinned, hair cut short, wearing a blue jacket and dark trousers and had a belt around his neck — looped, just hanging around his neck. She gave this description to

Detective Hicks in the presence of Detectives Leathers and McCrea. The following day these officers went out, talked to people in the neighborhood and brought in two young colored boys who resembled the description given police. Mrs. Meachum, who had returned to the police station, viewed them and exonerated them. The officers took these two boys home. Twenty minutes later defendant and three other colored boys, to wit, Otis Pipkins, age 16, Lonnie Williams, age 15, and Bobby Brown, age 16, were picked up at 115 Hunt Street and brought to the police station. Defendant was wearing a shirt and dungaree-type pants and had an ordinary men's belt looped around his neck. One of the other boys had on a dark navy blue jacket and a pair of dark trousers. One had on a dark sweater. Pipkins and Williams and defendant were the same size, although one was somewhat darker than defendant. Brown was a little taller. All four "kinda fit the description" given the officers by Mrs. Meachum.

These four suspects were placed in a room, and Mrs. Meachum viewed them on request of the officers. The clothing worn by the suspects remained unchanged. Nothing had been added and nothing had been removed when Mrs. Meachum first looked at them. Then one of the officers asked defendant to put on the blue jacket worn by one of the other boys, and Mrs. Meachum viewed the four of them again. She viewed the suspects through a two-way mirror. No one prompted her. She testified on voir dire and before the jury as follows: "I told Detective Hicks I was pretty sure that he [defendant] was the one. . . . I do not have any doubts about this individual being the one that assaulted me. He didn't have on the clothes that he had on the night before and that made him look a little different. *I won't ever forget his face.* He had the belt hanging around his neck. I did see him another time. He put — they put the clothes back on that he had on the night before. They told him to, I guess, and I went back and saw him. I did not have any trouble identifying him that time. I was positive. I have never been doubtful about my identification. . . . I pointed him out before they had put the clothes on him and then after they put the clothes on him there was no doubt about it."

Judged by the totality of these circumstances, was this lineup "so unnecessarily suggestive and conducive to irreparable mistaken identification" that it offended fundamental standards of decency, fairness and justice and thus denied due process of law to this defendant? Let us examine the circumstances which have been the basis for judicial answer in other cases.

In *United States ex rel. Geralds v. Deegan,* 292 F. Supp. 968, the victims, who had previously described the robber as a Negro, were

summoned to the police station to view a suspect twenty days after the robbery and presented with one Negro man in custody of a white officer. They identified the suspect in each other's presence when he, still alone and without others for image or voice comparison, donned the robber's porkpie hat and spoke the words "Where's the money?" Held: Such pretrial confrontation was unnecessarily and unfairly suggestive and conducive to mistaken identification amounting to denial of due process.

In *Foster v. California, supra* (394 U.S. 440, 22 L. Ed. 2d 402, 89 S. Ct. 1127), Foster was charged with the armed robbery of a Western Union Office. The only witness to the crime was Joseph David, the manager. After Foster had been arrested, David was called to the police station to view a lineup consisting of Foster, six feet tall, and two short men, five feet, five or six inches tall. Foster wore a leather jacket similar to the one David had seen underneath the coveralls worn by the robber. After seeing this lineup David could not positively identify Foster. David asked to speak to Foster alone and did so. He was still uncertain. A week or ten days later the police arranged for David to view a second lineup with five men in it. Foster was the only person in the second lineup who had appeared in the first. This time David was "convinced" that Foster was the man. Held: "The suggestive elements in this identification procedure made it all but inevitable that David would identify petitioner whether or not he was in fact 'the man'. In effect, the police repeatedly said to the witness, 'This is the man.' . . . This procedure so undermined the reliability of the eyewitness identification as to violate due process."

In *People v. Terry*, 77 Cal. Rptr. 460, 454 P. 2d 36, the only evidence regarding lineup was a bank teller's testimony that he described the robber to the police on the day of the robbery as a man in his early thirties. The persons in the lineup, other than Terry and a co-defendant, were in their teens or early twenties. Held: This alone is not so unnecessarily suggestive as to constitute a denial of due process.

In *People v. Caruso*, 68 Cal. 2d 183, 436 P. 2d 336, 65 Cal. Rptr. 336, defendant was a big man with a dark complexion and dark wavy hair. The eyewitness to the robbery remembered that the robber had these characteristics. Caruso was placed in a lineup with four companions none of which had dark wavy hair or a dark complexion or was his size. Held: The lineup was unnecessarily suggestive and conducive to mistaken identification and violative of due process.

In *People v. Hogan*, 70 Cal. Rptr. 448, defendant was charged

with burglary. A witness, Quincy Thomas, had seen a Negro commit the burglary and so informed the police. Defendant, a Negro, was placed in a lineup with a Mexican man and two white men. Obviously if Thomas chose anyone in the lineup, defendant was singularly marked for identification. Held: The contrasting composition of the lineup was so unfairly suggestive as to constitute denial of due process.

These cases illustrate the suggestive, unfair type of lineup referred to in *Wade, Gilbert,* and *Stovall* and condemned by the United States Supreme Court in *Foster v. California, supra.*

[26] By comparison, in the case before us Mrs. Meachum had observed defendant with sufficient particularity at the scene of the crime, even though visibility was poor, to inform the police that her attacker was colored, young, dark skinned, had a very smooth face, hair cut short, wore a blue jacket with dark trousers and had a belt looped around his neck. This is a detailed description. There is no discrepancy between it and the actual appearance of defendant. She has never identified any other person. She has shown no hesitancy whatsoever in her identification. Rather, she says "I do not have any doubts about this individual being the one that assaulted me. . . . I won't ever forget his face. . . . I was positive. . . . I have never been doubtful about my identification." The lapse of time between the act and her identification was barely twenty-four hours. Her memory was still fresh. Furthermore, three of the four boys in the lineup were the same size, and all were about the same age. One of the boys wore a dark blue jacket and dark trousers — the same sort of garments Mrs. Meachum told the police her assailant wore. Yet she exonerated him. Then defendant was asked to don this jacket. The belt around defendant's neck was the only mark of identification peculiar to him alone. It was placed there by defendant himself — not by law enforcement authorities. The officers were under no compulsion, constitutional or otherwise, to remove it. Nor were they required to place similar belts around the necks of the other boys in the lineup. Its presence cannot be attributed to the officers or regarded as the kind of rigged "suggestiveness" in identification procedures which *Wade* and *Gilbert* and *Foster* were designed to deter. Its presence was simply an existing fact — it was around defendant's neck when he was picked up, there when he was taken to the police station, and still there when viewed by the victim. No one put the belt on him and no one asked him to remove it. The victim was permitted to see him in raiment of his own choosing. Considering the totality of circumstances, as we are required to do, we hold that the lineup in this case did not offend constitutional requirements and

did not deny due process guaranteed by the Fourteenth Amendment. "The basic purpose of a trial is the determination of truth. . . ." *Tehan v. Shott,* 382 U.S. 406, 15 L. Ed. 2d 453, 86 S. Ct. 459. This assignment of error is overruled.

[27]    Defendant's assignment of error based on the admission of items of clothing worn by Mrs. Meachum (skirt, bra, blouse, slip, shoes and raincoat) is overruled. Articles of clothing identified as worn by the victim at the time the crime was committed are competent evidence, and their admission has been approved in many decisions of this Court. *State v. Vann,* 162 N.C. 534, 77 S.E. 295; *State v. Fleming,* 202 N.C. 512, 163 S.E. 453; State v. Wall, 205 N.C. 659, 172 S.E. 216; *State v. Petry,* 226 N.C. 78, 36 S.E. 2d 653; *State v. Speller,* 230 N.C. 345, 53 S.E. 2d 294; *State v. Bass,* 249 N.C. 209, 105 S.E. 2d 645; *State v. Atkinson,* 275 N.C. 288, 167 S.E. 2d 241.

The State, over defendant's objection, offered in evidence the shoes and pants defendant allegedly wore on the night of the crime. Defendant argues in his brief that this was error because (1) the items of clothing were of no probative value and (2) their possession by the State was the result of an illegal search and seizure. No further argument or citation of authority on this point appears in the brief. Nevertheless, we examine the record with respect to defendant's shoes and pants.

[28]    Detective Hicks testified over objection that he took a pair of pants from defendant, carried them personally to the S.B.I. laboratory in Raleigh, and that they were later returned to him. The pants were then identified and offered in evidence over defendant's objection. These pants were competent evidence. No right of defendant, constitutional or otherwise, was violated when the officer required him to surrender for examination and analysis the pants worn by him at the time of his arrest. *State v. Peele,* 274 N.C. 106, 161 S.E. 2d 568; *State v. Gaskill,* 256 N.C. 652, 124 S.E. 2d 873; *State v. Tippett,* 270 N.C. 588, 155 S.E. 2d 269; *State v. Colson, supra.* No search was involved. This exception has no merit.

[29]    Detective McCrea then testified over objection that he got a pair of shoes (identified as S-14 and S-15) at 307 Canal Street where Mrs. Lula Poole gave them to him. This witness was then withdrawn temporarily and Mrs. Lula Poole was placed on the stand by the State. She testified that defendant, his mother, and several other grandchildren, lived with her in a house which she rented herself at 307 Canal Street; that defendant is her grandson; that S-14 and S-15 are defendant's shoes which Mr. McCrea took from under the bed. At this point, defendant moved to strike her testimony about

STATE *v.* ROGERS

the shoes, the jury was excused and, on voir dire, Mrs. Poole said Detective McCrea and another officer came to her house and were admitted by some of the children; that McCrea said he wanted defendant's shoes — was hunting his shoes and his pants; that she didn't tell them to leave; that they didn't ask permission to look around the house and she didn't tell them they could; that he first mentioned the shoes when he got upstairs; that she didn't object to his going upstairs — that she went up behind him and told him where defendant's room was located; that she did not give the shoes to Officer McCrea, but he got them from under the bed where the boys slept.

The jury then returned to the courtroom, defendant's motion to strike was denied, and direct examination of Mrs. Poole was resumed by the solicitor in the presence of the jury. She again identified the shoes as belonging to defendant, stated they were under the bed where defendant slept but denied any knowledge as to whether he wore them on the previous Saturday. She said defendant's shoes were muddy because he had worn them while playing baseball and basketball at the East End School on the previous Friday. On reflection she said he did not wear those shoes the previous Saturday but had on his tennis shoes.

Officer McCrea then testified before the jury without objection that a teenaged girl let him in the house; that Mrs. Poole went upstairs with him and gave Rogers' shoes to him; that he didn't know Rogers' shoes from anyone else's — "she gave them to me."

Detective Upchurch testified before the jury without objection that he went with Officer McCrea to Mrs. Poole's house; that defendant's mother and several young girls were there; that they talked to defendant's mother and to Mrs. Poole and asked about some shoes and clothes defendant was wearing; that Mrs. Poole went upstairs into a bedroom "and Detective McCrea and myself went up there and she picked up these shoes here and gave them to us there in the room"; that the pair of shoes was all they got.

Officer Hicks was recalled and testified that he took the shoes to a chemist in the SBI office who later returned them to him. The shoes were then offered in evidence over defendant's objection.

Defendant assigns no reason, argument or authority in his brief to support the assignment except to say that the items of clothing worn by defendant were obtained by illegal search and seizure and were "devoid of probative value and should therefore have been excluded." The shoes themselves prove nothing and their admission

was harmless. Only the testimony gives them any significance. Mrs. Poole's testimony about them, seemingly favorable to defendant, was admitted over his objection. Other testimony concerning them by Detective McCrea, Detective Upchurch, Officer Hicks and Dr. Buol, the soil expert, was admitted *without objection*. "It is the well established rule with us that when incompetent evidence is admitted over objection, but the same evidence has theretofore or thereafter been admitted without objection, the benefit of the objection is ordinarily lost. . . ." *Jones v. Bailey*, 246 N.C. 599, 99 S.E. 2d 768. Exception to the admission of such testimony "is waived when testimony of the same import is thereafter admitted without objection." 1 Strong's N. C. Index 2d, Appeal and Error, Sec. 30; *Harvel's Inc. v. Eggleston*, 268 N.C. 388, 150 S.E. 2d 786. This assignment is overruled.

In the trial below, we find

No error.