UNITED STATES of America,
Plaintiff-Appellee,

v.

Darwin Clark BAILEY, Defendant-
Appellant.

No. 72–1799

Summary Calendar.*

United States Court of Appeals,
Fifth Circuit.

Sept. 14, 1972.

Rehearing Granted Nov. 7, 1972.

---

* Rule 18, 5 Cir.; *see* Isbell Enterprises, Inc. v. Citizens Casualty Co. of New York, 5 Cir. 1970, 431 F.2d 409.

John B. Farese, Ashland, Miss., for defendant-appellant.

H. M. Ray, U. S. Atty., Alfred E. Moreton, III, Asst. U. S. Atty., Oxford, Miss., for plaintiff-appellee.

Before JOHN R. BROWN, Chief Judge, and GOLDBERG and MORGAN, Circuit Judges.

GOLDBERG, Circuit Judge:

This case is a complex drama consisting of many acts and scenes and involving a cast of many players. It reaches us in the form of an appeal from a Mississippi Highway Patrolman's conviction of robbery of a federally insured bank in violation of 18 U.S.C. § 2113(a) and (d). Our role as critics is limited, however, for although in reviewing this case we find much to criticize, we are compelled by precedent to affirm the conviction. For reasons shortly to be stated, we regret that it is not in our power to do otherwise.

## I. THE FACTUAL SETTING

The factual setting from which this case arises is extremely complicated. Because the law to be applied turns on precise and narrow factual distinctions, it is necessary that we set out the facts in unusually great detail.

This drama opened at approximately 10:45 in the morning of March 8, 1971, with the armed robbery of the Citizens Bank of Byhalia, Mississippi, by a gunman whose appearance and clothing a bank officer, an assistant cashier, and other witnesses were able to describe. The assistant cashier from who the robber took the money had the presence of mind to include in the cash handed over a bundle of "bait money." [1] As the bank

---

1. "Bait money" is currency that a bank has identified and that is kept in a teller's cash drawer in order that it might be included in money given to a robber. In this case, the assistant cashier had pre- viously recorded the denominations of a stack of bills along with the identification numbers, dates and places of printing, and the name of the Secretary of the Treasury appearing on each bill.

alarms sounded, a passing witness saw a car driving from a street behind the bank.

The police were alerted and roadblocks were established. One of those assigned to man a roadblock was appellant, Darwin Clark Bailey, who remained at his post with police officer John Shaw until 2:30 that afternoon. At that time Shaw drove appellant to his home. From there, appellant drove the police car and Shaw drove appellant's car to a spot where they left appellant's car for his wife to have after she left work. The car was later described as similar to the one seen at the bank that morning. Later that night appellant went to the American Legion Hut in Holly Springs, Mississippi. Although it violated Highway Patrol rules and regulations, he often gambled at the Hut and he gambled there that night.

Following an intermission of one week, Inspector H. H. Waycaster, appellant's superior officer, ordered appellant to appear at the sheriff's office in Holly Springs. Appellant later testified that Waycaster told him the meeting was to discuss appellant's gambling activities. Appellant also testified, however, that he had been told by Patrolman Charles C. Hinds that the police suspected that appellant had spent some of the bait money taken in the robbery. Furthermore, Giles W. Crisler, Mississippi Commissioner of Public Safety, testified that he had been informed that day by Assistant Commissioner J. D. Gardner that the bait money had been traced to appellant, whereupon Crisler had ordered Gardner to send Inspectors Waycaster and Wood Stringer to Holly Springs to investigate the matter. Additionally, Stringer testified that he had advised Crisler of the bank robbery suspicions.

Appellant went to the courthouse on March 15, 1971, and was taken to the Sheriff's private office [Interrogation I]. Present were appellant, the Sheriff, FBI Agent Richard T. Rabideau, Stringer, and perhaps two other patrolmen. The purpose for which the meeting was ordered is now disputed. Appellant's position is that he understood that his gambling activities were being investigated. Some of the government's witnesses contend, however, that they thought all along that appellant understood the robbery was actually the object of their investigation. In any event, appellant signed a *Miranda* warning form [*Miranda* Warning I], *see* Miranda v. Arizona, 1966, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, although he testified at his trial that he signed it without reading it.

Rabideau testified that after appellant had received the *Miranda* warning Stringer advised appellant that the Highway Patrol desired to afford him an opportunity to account for his activities of the past week, that appellant indicated a willingness to discuss the matter, and that appellant spontaneously requested that a letter be placed in his file with the Highway Patrol exonerating him of any involvement in the bank robbery. During the course of the meeting, appellant described his actions from the date of the robbery, but he did not discuss further the robbery itself. The principal topic discussed was appellant's gambling. At the conclusion of the meeting, appellant signed a waiver to permit a search to be made of his house and was ordered to appear in Jackson, Mississippi, before Commissioner Crisler the next morning. A search was subsequently conducted by Rabideau, another FBI Agent, and a Deputy Sheriff, but no evidence was seized [Search I].

Appellant testified that later that day Hinds told him that three of the baited bills had been traced to appellant. He testified further that this was the first definite indication he had that he was implicated in the robbery.

On the night of March 15, appellant apparently became despondent and began drinking. He went back to the American Legion Hut and gambled for a short while. He then went to the Colonial Restaurant in Holly Springs and drank black coffee for approximately two hours. About 1:00 a. m. Highway Patrolmen Billie Hastie and Bryant House

arrived and took appellant to the police station lounge. The other two officers, knowing of appellant's pending appointment in Jackson that morning, stayed with him at the police station for several hours. Appellant contends that he was kept up drinking coffee, but there was testimony that he managed to sleep part of the time. Sometime after 4:00 a. m. the two officers took appellant to his house, where he showered and changed clothes.

From his house, appellant was taken by Patrolman House to Pontotoc, Mississippi, where he met Stringer. Stringer and appellant picked up Waycaster and all three drove to Jackson, arriving around 8:30 in the morning. While they were en route, another FBI Agent searched appellant's house with the permission of appellant's wife [Search II]. Again, however, no evidence was seized.

In Jackson, appellant reported to the office of Personnel Assistant Charles E. Snodgrass. Appellant waited until 11:00 a. m. before he was called into Snodgrass's office [Interrogation II]. Snodgrass testified that he warned appellant of his rights as a precautionary matter [*Miranda* Warning II], although no warning affirmatively appears in a typed transcript of the conversation. Appellant signed the transcribed statement, which related entirely to his gambling except for the following remark made by appellant:

> "On the night of March 15 I was off duty and out of uniform. I was concerned because those officers investigating the bank robbery in Byhalia seemed to think I had something to do with the robbery and they indicated that three of the twenty-dollar bills taken in the robbery had been traced to me. . . ."

After he signed the statement appellant was directed to the office of Commissioner Crisler, where he was told that he was to be temporarily suspended from the Patrol pending a hearing due to his gambling and drinking habits.

Appellant testified that when he returned to Snodgrass's office, Snodgrass interrogated him regarding the bank robbery. Appellant further testified that he denied any involvement in the robbery but that Snodgrass recommended that if he was guilty it would be better to confess. Appellant again denied guilt. Snodgrass, however, recalls that this conversation concerned gambling and that appellant brought up the matter of the robbery. He testified further that he actually advised appellant in purely an off-hand manner that it would be better to confess to any crimes he had committed.

Stringer, Waycaster, and an Assistant Inspector drove appellant back to Holly Springs. They picked up Patrolman House at the courthouse then proceeded to appellant's house. There appellant turned in his Highway Patrol uniform and equipment, pursuant to the suspension. House requested and received permission to drive appellant back to the Sheriff's office alone. On the way, House, who had been appellant's "riding partner," engaged appellant in an emotional conversation relating to the robbery. House pled with appellant to give himself up if he was guilty, saying that it would be better for all concerned if he would do so. Both men began crying and appellant told House that he wanted to confess.

When they arrived at the courthouse, appellant volunteered that he was the man the authorities were looking for. He signed a *Miranda* warning form [*Miranda* Warning III], was questioned [Interrogation III], and signed a handwritten confession admitting the bank robbery and giving a fully detailed account of his involvement. He admitted owning and using the car and the apparel that the witnesses had described. Appellant was thereupon arrested. He then signed another waiver allowing a search of his home [Search III], and the ensuing search turned up the incriminating clothing.

## II. THE TRIAL BELOW

Appellant was first brought to trial before a jury in the United States District Court for the Northern District of Mississippi in October, 1971. The very able district judge conducted a lengthy pre-trial evidentiary hearing on appellant's motion to suppress evidence of the confession on grounds of involuntariness. After taking two days of testimony, the district judge made detailed findings of fact and conclusions of law in which he held that the confession met constitutional standards of voluntariness.[2]

After the case had been presented and the jury had retired to consider their verdict, the jury advised the judge that they were unable to agree to a verdict. The trial judge advised counsel in chambers that he intended to give the jury an *Allen* charge. *See* Allen v. United States, 1896, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528. Appellant's attorney vigorously ob-

jected to any use of the *Allen* charge and argued alternatively that if the charge were to be given that an additional admonitory instruction should also be given to remind the jurors of their duty to abide by their own views of the case. The judge then gave the jury an *Allen* charge, set out below,[3] but he included the requested admonition. The jury remained hopelessly deadlocked, however, and a mistrial was declared.

At appellant's second trial in March, 1972, the district judge again found that the confession met all applicable standards of voluntariness and allowed it to be introduced into evidence. Furthermore, he submitted to the jury the question of the voluntariness of the confession. Exercising an abundance of caution, the judge instructed the jury that unless they found the confession to be voluntary beyond a reasonable doubt they were to disregard it altogether.[4]

2. The findings of fact and conclusions of law made by the district judge appear as an appendix to this opinion.

3. "All right. I desire to give you some additional instructions. You have been considering the case in the jury room for approximately five hours when we deduct the time out for lunch.
   "As I charged you this morning, in order to reach a verdict in this case, it must be unanimous, each of you must agree to the verdict and in the final analysis each of you must go by your individual judgments you have about the case. That is to say, each one of you must decide the case in your own mind. Your twelve minds must agree. And under no circumstances are you to surrender an honest, conscientious conviction that you hold about this evidence. But I charge you that in a large percentage of cases absolute certainty cannot be expected. Although the verdict must be the verdict of each individual juror and not a mere acquiescence in the conclusion of his fellow jurors, yet you should examine the questions submitted with candor and with the proper regard and deference to the opinions of each other.
   "Now it is your duty to decide this case if you can conscientiously do so. No juror is expected to do violence to his judgment, yet you should listen with a disposition to be convinced of each other's arguments. If a much larger number are for

conviction, a dissenting juror should consider whether his doubt is a reasonable one, which made no impression upon the minds of so many men and women equally honest and equally intelligent as himself. If, on the other hand, a majority of you are for acquittal, the minority ought to ask themselves whether they might not reasonably doubt the correctness of a judgment which was not concurred in by the majority. Now, bear in mind as you deliberate this case further that you are not to surrender your honest convictions, but you are to endeavor to reach an agreement if you can do so without violence to your judgment.
   "I am now going to ask that you go back to your jury room and consider further your verdict in this case."

4. "Now, evidence has been introduced that the defendant made an admission or a confession, allegedly, relating to the crime charged in the indictment. Now, you, the jury, must weigh any confession with caution and scrutinize the circumstances surrounding it to determine whether it was freely and voluntarily made. Now, if the jury finds that such confession was made freely and voluntarily by the defendant, with knowledge of the nature of the confession and without fear or coercion, either physical or psychological, or promise of reward, then the jury may consider it—the confession—together with all the other evidence in determining

The jury retired to consider the case at 11:30 a. m. Following a noon-hour recess for lunch, they sent the judge a note at 3:00 p. m. saying that they were unable to agree to a verdict. At 4:00 p. m. the judge called the jury in for additional instructions. He again gave an *Allen* charge, reproduced below,[5] but the language used differed somewhat from that used in the first trial. Although he had not notified the attorneys that he had received a note from the jury or that he intended to instruct the jury further, the trial judge afforded counsel an opportunity to object after the jury had returned to their delibera-

the guilt or innocence of the defendant. However, if you, the jury, find from the evidence that the confession was not made freely and voluntarily by the defendant, you, the jury, should disregard it entirely.

.  .  .  .  .

"Now, in determining whether any statement or act or omission claimed to have been made by a defendant outside of the Court and after a crime had been committed was knowingly made or done, you, the jury, should consider the age, the sex, the training, the education, the occupation, the physical and mental condition of the defendant and his treatment while in custody or under interrogation as shown by the evidence in this case and also all other circumstances in evidence surrounding the making of the statement or act or omission, including whether before the statement or act or omission was made or done, the defendant knew or had been told and understood that he was not obligated or required to make or do the statement or act or omission claimed to have been done or omitted by him, .that any statement or act or omission which he might make or do could be used against him in court, that he was entitled to the assistance of counsel before making any statement, either oral or in writing, or before doing any act or omission, and that if he was without money or means to retain counsel of his own choice, an attorney would be appointed to advise and represent him free of cost or obligation.

.  .  .  .  .

"I charge you further that in the event you find that any alleged confession or omission in the evidence here was not made freely and voluntarily by the defendant, you should not only disregard it in its entirety, but you should also further disregard any and all other evidence which has been presented during this trial which was obtained either directly or indirectly on account of or as a result of the confession that you find not to have been made freely and voluntarily."

5. "The Court desires to give this additional instruction to the members of the jury.

I wish you would pay heed to it.

"Now, while undoubtedly, members of the jury, the verdict of a jury should represent the opinion of each individual juror, it by no means follows that opinions may not be changed by conference in the jury room. The very object of the jury system is to secure unanimity by comparison of views and by arguments among the jurors themselves. Every juror should listen with deference to the arguments of the other jurors, and with a distrust of his own judgment if he finds the larger majority of the jury takes a different view of the case than that which he himself takes. No juror should go to the jury room with a blind determination that the verdict should represent his opinion of the case at that moment or that he should close his eyes to the arguments of the other jurors, who are equally honest and intelligent as himself.

"So I charge you that although the verdict must be the verdict of each individual juror and not a mere acquiescence in the conclusion of his fellows, yet you should examine the questions submitted wih candor and with a proper regard and deference to the opinions of each other.

"Now, it is your duty to decide this case, if you can conscientiously do so. No juror is expected to do violence to his own conscience. You should listen with a disposition to be convinced of each other's arguments. If a much larger number are for conviction, a dissenting juror should consider whether his doubt is a reasonable doubt, which made no impression upon the minds of so many men equally honest and intelligent as himself.

"Now, if, on the other hand, a majority of you are for acquittal, the minority ought to ask themselves whether they might not reasonably doubt the correctness of a judgment which was not concurred in by the majority.

"Now, having given you these additional instructions, it is my hope that you will return to the jury room and endeavor to reach a verdict. And with these instructions in mind, I am now going to ask you to return to the jury room and consider further your verdict."

tions. Appellant again entered a strong objection to use of the *Allen* charge.

At 5:30 p. m. appellant moved for a mistrial on the grounds that any verdict reached would be the result of judicial coercion. Factors cited by appellant to support his motion included the giving of the *Allen* charge, the lateness of the hour, the inclemency of the weather, the danger of travel on the roads, and the fact that it was a Friday evening and that many jurors were women. The motion was denied and at 5:50 p. m. the jury returned a verdict of guilty. Appellant appeals from the subsequent entry of a judgment of conviction and assigns three grounds of error. We discuss those contentions in ascending order of legal difficulty.

### III. EXCUSAL OF JURORS

■ ■ Appellant complains that the trial judge committed prejudicial error when he excused for cause two jurors who merely acknowledged their acquaintance with appellant. This argument is without merit. "[W]hile impaneling a jury the trial court has a serious duty to determine the question of actual bias, and a broad discretion in its rulings on challenges therefor." Dennis v. United States, 1950, 339 U.S. 162, 168, 70 S.Ct. 519, 521, 94 L.Ed. 734, 740. Absent a clear abuse of that discretion, the trial judge's action will not be disturbed on appeal. We can find nothing abusive or prejudicial in the excusal of jurors admittedly acquainted, regardless how remotely, with one of the parties to the proceedings.

### IV. ADMISSION OF THE CONFESSION

Appellant's second assignment of trial court error is his assertion that *"under the totality of circumstances, including inadequate Miranda warnings and [the] coercive atmosphere of a process of interrogation which resulted in [the making of a] confession after repeated denials by defendant, defendant's confession should have been excluded from evidence."* Although appellant directly challenges the admissibility of the written confession obtained from Interrogation III, he suggests that the totality of circumstances must be studied and that they reveal as a matter of law that the confession was involuntary. Appellant's basic argument is that the cumulative effect of all of appellant's contacts and transactions with law enforcement personnel renders his confession involuntary as a matter of law. That conclusion rests on a series of assumed factual premises that the trial court found not to exist. Rather than laboriously retrace the relevant chronology step-by-step to show that the district court's findings regarding voluntariness were justified and proper, we deem it sufficient to reproduce that court's findings of fact in an appendix to this opinion.

■ We have studied the record ourselves, and we find ample evidence to support the trial court's findings. We find further that based on those findings of fact that trial court made proper conclusions of law, which we also reproduce in the appendix. The dispositive conclusion is as follows:

> "The court can conclude from these facts, indeed it must conclude beyond a reasonable doubt that this confession was free and voluntary. And its voluntariness has been proved beyond a reasonable doubt."

We do not read the opposing briefs in this appeal as disputing the basic controlling law; rather, appellant seems to ask that the facts be determined anew. Finding no trial court error, we cannot redetermine the facts on our own. Measured by any standard of appellate review, the trial court's findings of voluntariness were fully justified, proper, and supported by the record.

Within his basic claim of involuntariness, appellant advances three specific arguments that deserve our attention. First, he suggests that constitutional standards governing "in custody" interrogations were not followed here. That precise point discussed at length in Miranda v. Arizona, *supra*, was considered

by the trial court and it was rejected. The gist of the trial court's reasoning is that whenever appellant was even arguably "in custody" and a warning therefore required, he was in fact properly warned.[6]

The trial court found that the conversation between appellant and Patrolman House, for example, which appellant particularly attacks as tainting the signed confession, did not occur in a custody context and that appellant's statements in that conversation were made knowingly and voluntarily. Furthermore, we note that the *Miranda* case itself stated,

"In dealing with statements obtained through interrogation, we do not purport to find all confessions inadmissible. Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. . . . There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime, or a person who calls the police to offer a confession or any other statement he desires to make. Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today."

384 U.S. at 478, 86 S.Ct. at 1630, 16 L.Ed. 2d at 726. *See also* United States v. Frazier, 5 Cir. 1970, 434 F.2d 994; Posey v. United States, 5 Cir. 1969, 416 F.2d 545, cert. denied, 1970, 397 U.S. 946, 90 S.Ct. 965, 25 L.Ed.2d 127.

The second specific argument that appellant advances is that handing a written *Miranda* warning card to one being questioned will not suffice to satisfy the requirement of an *effective* warning. This court held in Fritts v. United States, 5 Cir. 1968, 395 F.2d 219, 220, that presenting a 4 x 5 inch printed card containing the *Miranda* warnings and entitled "Your Rights" can suffice. We also stated that "the better practice would suggest that a statement of the defendant's rights be presented to him in larger type and on a larger card or paper." *Id. See also* United States v. Alexander, 3 Cir. 1971, 441 F.2d 403; United States v. Van Dusen, 1 Cir. 1970, 431 F.2d 1278; United States v. Osterberg, 9 Cir. 1970, 423 F.2d 704, cert. denied, 1970, 399 U.S. 914, 90 S.Ct. 2216, 26 L.Ed.2d 571. We note with approval that in the instant case the "better practice" was followed.[7]

■ We do not mean to intimate, as counsel for appellant fears, that one schooled in the rights afforded by *Miranda* need not be effectively warned and told of his rights nonetheless, nor do we

6. This holding specifically embraces—and in no way derogates—the following language in Miranda v. Arizona, 1966, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed. 2d 694, 706:

"[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."

7. The *Miranda* warnings [I & III] signed by appellant are printed on 8 × 10½ inch paper headed in bold print, "INTERRO-

GATION: ADVICE OF RIGHTS. YOUR RIGHTS."
The form reads as follows:

"Before we ask you any questions, you must understand your rights.

"You have the right to remain silent.

"Anything you say can be used against you in court.

"You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning.

"If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

"If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer."

think that the decision of the trial court rested on such an erroneous view of the law.[8] We are merely unwilling to hold as a matter of law that a printed card, read by a person shown to have understood the warnings, cannot satisfy *Miranda*.

Appellant's third specific argument regarding the voluntariness of his confession is that this is a case of involuntariness due to an accumulation of psychological pressures constituting impermissible coercion. That argument, much like the other voluntariness claims, may be logical, but the test is not whether appellant's view of the case is believable. Rather, the courts entrust to a factfinder, here the district judge, the serious duty of determining exactly what factual events occurred. His declaration of the facts will not be disturbed on appeal absent serious or plain error.

■ Admittedly, it is the government that bears the "heavy burden" of demonstrating that a criminal confession was in fact and in law voluntary, *see* Miranda v. Arizona, *supra*, 384 U.S. at 475, 86 S.Ct. 1602, 16 L.Ed.2d at 724, but the government has met that burden here. The trial court found that the facts occurred in the manner the government alleged, that is, that "[w]hen the defendant made these statements, his will was not broken nor was his intellect overpowered."

■ Appellant correctly states that police overreaching, mental coercion, and actual or implied promises—regardless of the motive of the person eliciting the confession—may render the statement obtained involuntary. Here, however, it was found that the impermissible police actions did not occur. Furthermore, we recognize that an appellate court reviewing a case in which an allegedly involuntary confession was introduced has

a duty to consider the totality of the circumstances under which the statements were made and to ascertain whether the confession was the product of the defendant's free and rational choice. *E. g.* Greenwald v. Wisconsin, 1968, 390 U.S. 519, 88 S.Ct. 1152, 20 L.Ed.2d 77. But from the totality of the circumstances found to have occurred in the instant case, we are unable to say that appellant's confession was involuntary as a matter of law due to psychological coercion.

Finally, we note that appellant was actually afforded greater protection than he could have demanded in the determination process regarding his voluntariness claim. Only this year the Supreme Court held that the Constitution does not require as a precondition to the admission of a confession more than proof by a preponderance of the evidence that the confession was voluntary. Lego v. Twomey, 1972, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618. The court also held in that case that a defendant whose confession has been found to be voluntary by the trial judge is not constitutionally entitled to have the jury also consider his voluntariness claim.

Here, however, the trial judge followed the practice commended by the dissent in Lego v. Twomey, *supra*, and held necessary by at least two federal circuits as an exercise of their supervisory powers, *e. g.*, Ralph v. Warden, 4 Cir. 1970, 438 F.2d 786, 793, and Pea v. United States, 1968, 130 U.S.App.D.C. 66, 397 F.2d 627, of requiring proof beyond a reasonable doubt. The court below held the evidentiary hearing required by Jackson v. Denno, 1964, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908, and found that the voluntariness of appellant's confession was shown beyond a reasonable doubt. Nevertheless, the trial judge

---

8. The Supreme Court held in Miranda v. Arizona,

 "[W]e will not pause to inquire in individual cases whether the defendant was aware of his rights without a warning being given. Assessments of the knowledge the defendant possessed, based on information as to his age, education, intelligence, or prior contact with authorities, can never be more than speculation; a warning is a clear-cut fact."

384 U.S. at 468–469, 86 S.Ct. at 1625, 16 L.Ed.2d at 720.

charged the jury that they too must find the confession voluntary beyond a reasonable doubt, which their verdict of guilty indicates they did.

In sum, we agree with the trial court that the government has shown that no constitutionally invalid use has been made of involuntary statements made by appellant to law enforcement personnel.

## V. THE *ALLEN* CHARGE

Appellant levels a triple-barreled attack against the *Allen* charge that was given to the jury that convicted him. His first volley consists of a lengthy argument that the supplemental instructions given in the court below cannot be squared with the language approved in existing cases. His second salvo is a thoroughgoing argument that the charge was in fact coercive in this case. His final fusillade is an exhaustive and sweeping onslaught assailing the use of any form or variation of *Allen* charges.

9. *See* note 5 *supra*.

10. The Court paraphrased the charge as follows:

"[T]hat in a large proportion of cases absolute certainty could not be expected; that although the verdict must be the verdict of each individual juror, and not a mere acquiescence in the conclusion of his fellows, yet they should examine the question submitted with candor and with a proper regard and deference to the opinions of each other; that it was their duty to decide the case if they could conscientiously do so; that they should listen, with a disposition to be convinced, to each other's arguments; that, if much the larger number were for conviction, a dissenting juror should consider whether his doubt was a reasonable one which made no impression upon the minds of so many men, equally honest, equally intelligent with himself. If, upon the other hand, the majority was for acquittal, the minority ought to ask themselves whether they might not reasonably doubt the correctness of a judgment which was not concurred in by the majority."
164 U.S. at 501, 17 S.Ct. at 157, 41 L.Ed. at 530–31.
After thus defining the approved charge, the Court added a paragraph regarding the function of the jury:

### A. Stare Decisis & the Allen Charge Below

Appellant insists that even admitting arguendo the validity of supplemental charges generally, the instruction given here exceeded permissible limits enunciated in the reported cases. We cannot agree. The language selected by the trial judge [9] closely paralleled that of the *Allen* case itself. In Allen v. United States, 1896, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528, the Supreme Court approved the giving of a supplemental charge that was "taken literally" from Commonwealth v. Tuey, 62 Mass. (8 Cush.) 1 (1851), and State v. Smith, 49 Conn. 376 (1881).[10] The similarity between the charge given in appellant's trial and that approved in *Allen* would justify our ending the matter at this juncture, but appellant casts his attack on *Allen* with such specificity that we think an enlarged analysis is appropriate.

"While undoubtedly, the verdict of the jury should represent the opinion of each individual juror, it by no means follows that opinions may not be changed by conference in the jury-room. The very object of the jury system is to secure unanimity by a comparison of views, and by arguments among the jurors themselves. It certainly cannot be the law that each juror should not listen with deference to the arguments, and with a distrust of his own judgment, if he finds a large majority of the jury taking a different view of the case from what he does himself. It cannot be that each juror should go to the jury-room with a blind determination that the verdict shall represent his opinion of the case at that moment; or that he should close his ears to the arguments of men who are equally honest and intelligent as himself."
*Id.*

Strictly speaking, the *Allen* case is authority only for the paraphrase in the first paragraph; but courts have ignored the distinction by reading *both* paragraphs to deadlocked juries . . . ."
Note, On Instructing Deadlocked Juries, 78 Yale L.J. 100, 102 n. 12 (1968). That practice was followed here, but we are aware of no Fifth Circuit cases holding the reading of both paragraphs to the jury improper.

Appellant argues that the language in the charge that urges the minority to "distrust" their own views is particularly prejudicial. But because the *Allen* case itself used virtually identical language, we are unable to deem that portion of the instant charge improper. *See* Sikes v. United States, 5 Cir. 1960, 279 F.2d 561. Although this Court in United States v. Williams, 5 Cir. 1971, 447 F.2d 894, 899, described as "borderline" a charge that did not even use the word "distrust," there were other elements in *Williams* that clearly indicate the fault lay elsewhere than in the admonition to the minority to rethink their positions.[11] Similarly, Green v. United States, 5 Cir. 1962, 309 F.2d 852, which strongly criticized the *Allen* charge there used is distinguishable from the instant case. First, the trial judge in *Green* gave an *Allen* charge *before* the jury first retired to deliberate. Secondly, the *Green* instruction unequivocally stated that "the majority will have better judgment than the mere minority." 309 F.2d at 855. Neither of those circumstances is present here.

The assumption that the minority is *always* wrong is illogical. Were the choice ours alone to make, we might agree with Mark Twain's hyperbole, "Whenever you find that you are on the side of the *majority*, it is time to reform." *See id.* We would certainly agree with the following position:

"The language of the *Allen* charge itself is inherently unbalanced, for the emphasis is always upon a reconsideration by the minority. The fact that the court takes care to point out that the recalcitrant minority may stand either for conviction or for acquittal cannot alter the fact that the thrust of the charge is to put pressure on the dissenters. It is only they who are instructed to reconsider their views. The majority can remain adamant and still not violate the judge's instructions in any way. Such an inherently unbalanced charge places the sanction of the court behind the views of the majority, whatever they may be, and tempts the minority juror to relinquish his position simply because he has been the subject of a particular instruction."

Note, Due Process, Judicial Economy, and the Hung Jury: A Reexamination of the Allen Charge, 53 Va.L.Rev. 123, 129–30 (1967). Our own views notwithstanding, "no appellate court has [directly] required that an instruction aimed at producing a reconsideration by the minority be balanced by language requiring that the majority rethink its position as well." *Id. But see* United States v. Rogers, 4 Cir. 1961, 289 F.2d 433.

Appellant's next specific attack on the language of the instant charge is his assertion that when giving such a supplemental instruction the trial judge has a duty to remind the jurors of the burden of proof. That duty clearly exists in the First Circuit,[12] and one of the cases relied on by the Supreme Court in *Allen* emphasized the reinstruction on the burden of proof.[13] But the *Allen*

11. The court referred to the future juries that would be needed if the jury could not agree; the trial court had given the charge *sua sponte* without any indication whatsoever from the jury that they could not agree; finally, the appellate court specifically refused to decide the case on the *Allen* charge point—any language regarding *Allen* is dictum. Similarly, the criticism in Mangan v. Broderick & Bascom Rope Co., 7 Cir. 1965, 351 F.2d 24, directed at supplemental instructions that urge the minority to distrust their own views, although compellingly rational, is rank dictum.

12. *See* United States v. Flannery, 1 Cir. 1971, 451 F.2d 880. The court in *Flannery* relied on Pugliano v. United States, 1 Cir. 1965, 348 F.2d 902, where Chief Judge Aldrich characterized the reminder of the burden of proof as being the leaven making the *Allen* charge palatable 348 F.2d at 904.

The Tenth Circuit once required the reminder to be given, *see* Apodaca v. United States, 10 Cir. 1951, 188 F.2d 932, but that requirement has apparently lapsed. *See* DeVault v. United States, 10 Cir. 1964, 338 F.2d 179.

13. Commonwealth v. Tuey, 62 Mass. (8 Cush.) 1 (1851).

case rejected such a requirement and squarely held that the trial court, having once instructed the jury in its original charge regarding the presumption of innocence that the prosecution must overcome, "could not be required to repeat the charge . . . ." 164 U.S. 492, at 500, 17 S.Ct. 154, at 157, 41 L.Ed. 528, at 530. Although the issue has not heretofore been frontally decided in the Fifth Circuit, Estes v. United States, 5 Cir. 1964, 335 F.2d 609, 618–619, cert. denied, 1965, 379 U.S. 964, 85 S.Ct. 656, 13 L.Ed. 2d 559, makes clear that if the supplemental instruction admonishes as here that the jurors should not "acquiesce" in a verdict or do violence to their consciences, no harm will be found in the trial court's failure to reinstruct regarding the burden of proof.

▮▮▮ Appellant's final specific attack on the language used in the court below challenges what he interprets to be the judge's telling the jury that they "must decide" the case. We find that interpretation misguided, and we reject it. Although the trial judge told the jury it was their "duty to decide this case," he immediately added, "if you can conscientiously do so." Because that language is taken almost verbatim from the *Allen* case, we are unable to declare it error.

The trial judge also told the jury that he wished they "would pay heed" to his supplemental instructions. But unlike Huffman v. United States, 5 Cir. 1962, 297 F.2d 754, this is not a case where the judge "was laboring under a basic misapprehension: that a criminal trial must end with (1) a verdict of guilty or (2) a verdict of not guilty." 297 F.2d at 758. Nor is this a case like Kesley v. United States, 5 Cir. 1951, 47 F.2d 453, where the judge told the jury, "Gentlemen, it is very apparent to me that some of you are violating the sacredness of your oaths as jurors. There is no doubt, as far as the facts are concerned." *Id.* See also Bernal v. United States, 5 Cir. 1917, 241 F. 339, cert. denied, 1918, 245 U.S. 672, 38 S.Ct. 192, 62 L.Ed. 540, where it was held no error to imply that the jury was being stubborn and to say

that "the most stubborn thing on the face of this earth is a jackass." 241 F. at 343. Lastly, this is not a case like Jenkins v. United States, 1965, 380 U.S. 445, 85 S.Ct. 1059, 13 L.Ed.2d 957, where misstating the law by telling the jury, "You have got to reach a decision in this case," was found to be coercive. Rather, the charge given in the instant case seems clearly to fall within the following holding in Thaggard v. United States, 5 Cir. 1965, 354 F.2d 735, 739, cert. denied, 1966, 383 U.S. 958, 86 S.Ct. 1222, 16 L.Ed.2d 301:

> "Such a charge, so long as it makes plain to the jury that each member of the jury has a duty conscientiously to adhere to his own honest opinion and avoids creating the impression that there is anything improper, questionable, or contrary to good conscience for a juror to cause a mistrial, . . . is still a permissible charge to be given in proper circumstances in this Circuit."

*See also* Shaffman v. United States, 3 Cir. 1923, 289 F. 370, 374.

▮▮▮ Appellant further argues that the failure of the trial judge to notify counsel of his receiving the message from the jury and of his decision to give an *Allen* charge was prejudicial. The Ninth Circuit has found similar actions to be reversible error. United States v. Marken, 9 Cir. 1972, 457 F.2d 186. And the Supreme Court has spoken to this point in Shields v. United States, 1927, 273 U.S. 583, 47 S.Ct. 478, 71 L.Ed. 787, but the Court's central concern was the defendant's unqualified right to be "present" at each stage of the proceedings against him. In the instant case, however, the record indicates that appellant was present when the charge was given and that he immediately objected. His complaint is in actuality that he was not forewarned that the *Allen* charge would be given. Although at his first trial appellant's objections were heard before the *Allen* charge was delivered, we find no precedents that would allow us to find a duty in the Fifth Circuit on the part of the trial judge to notify the parties, so

long as they are present when the instruction is read to the jury, of his intention to do so.

### B. Whether the Charge Given Was Coercive

Just as semantic deviation from the approved *Allen* charge can require reversal, *see* United States v. Prentiss, 5 Cir. 1971, 446 F.2d 923; Powell v. United States, 5 Cir. 1962, 297 F.2d 318, 322, so too may verbatim recitation of the *Allen* language be found coercive under all particular circumstances of a given case. *Cf.* Thaggard v. United States, 5 Cir. 1965, 354 F.2d 735, 739 (*Allen* charges are permissible "in proper circumstances."). Appellant argues that this is such a case, that this verdict was "coerced" from the jury because they were improperly pressured by the following factors: the giving of the *Allen* charge, the lateness of the hour, the inclemency of the weather, the danger of travel on the roads, and the fact that it was a Friday evening and that many jurors were women. Appellant basically argues that the jurors were more interested in returning *any* verdict than in returning the "correct" verdict.

▮ We agree that there is a persuasive logic to appellant's theory, but we are once again compelled by precedent to reject it. United States v. Betancourt, 5 Cir. 1970, 427 F.2d 851, is very much in point and controls the disposition of this argument. We there said,

"We are not blind to the fact that this trial had begun at 9 o'clock on the day of the verdict, that the jury did not get the case until 6:13 p. m., that it reported itself deadlocked at 8:26 p. m., and that it did not return its verdict until 10:23 o'clock of a stormy night."

*Id.* at 854. Nor are we here blind to the circumstances cited by appellant. Nevertheless, we are forced by *Betancourt* to conclude that "[w]e perceive no basis for saving *as a matter of law* that the use of the *Allen* charge under the circumstances recited had a coercive effect on the jury." *Id.* (emphasis added).

We do not mean to imply that appellant's argument is entirely without legal merit. Portions of his theory deserve further mention.

"The timing of the *Allen*-type instruction has occasionally been a factor in appellate review of the instruction's coercive effect. . . . [When] the charge is delivered after the jury has retired and has reported that it is unable to reach a verdict, two aspects of the timing of the instruction have been considered. First, the courts have asked whether the interval between the retiring of the jury and the delivery of the instruction was so short that the trial court abused its discretion in calling the jury back and urging them to reach agreement. The second issue is whether the period between the delivery of the charge and the rendering of the verdict was so brief as to give rise to an inference that the jury was coerced by the instruction."

Note, *supra,* 53 Va.L.Rev. at 132.

We do not here have the timing that under the standing case law would allow us to find coercion as a matter of law. The instant instruction was given approximately 3½ hours after the jury first retired to deliberate; yet giving the charge only 1 hour, 5 minutes after the jury retired has been found to be not improperly precipitous. Andrews v. United States, 5 Cir. 1962, 309 F.2d 127.[14] The jury here redeliberated after receiving the supplemental instruction for approximately 1½ hours; yet *Andrews* refused to find that the jury's returning their verdict only 25 minutes after re-

---

14. The dissent thought that the giving of the charge so soon after the jury retired was entirely premature.

"I have not found any other case involving a deadlocked jury when the Allen charge was given so precipitately.

In the Allen case itself the supplemental instructions were not given until the jury had been out for six and one-half hours."

309 F.2d at 130 (Wisdom, J., dissenting).

ceiving the *Allen* charge revealed coercion as a matter of law.

▋ Lastly, we agree with appellant that the inference of coercion is here strengthened by the fact that a prior jury could not return a verdict in a trial of the same cause, even after the jury had received a somewhat "milder" *Allen* charge. The special concurrence in Thaggard v. United States, *supra*, thought it "significant that there had already been one hung jury in a previous trial." 354 F.2d at 740. The conviction there was affirmed nonetheless. And although we find appellant's argument that this verdict was coerced to be very persuasive, yet we are compelled by *Betancourt, Andrews* and *Thaggard* to reject it.

### C. Dynamiting the Jury: The Trouble with Allen

The problem facing a trial judge when a jury is unable to reach a verdict is by no means new. Fourteenth century jurists devised perhaps the most effective solution—deadlocked jurors were locked into an oxcart and carried about with the judge while he rode circuit and were permitted to leave the cart only when a verdict was reached.[15] More recently, judges have seen fit to deal with recalcitrant jurors in the following ways: by requiring the jurors to deliberate throughout the night, Commonwealth v. Moore, 398 Pa. 198, 157 A.2d 65 (1959); by threatening to lock up the jurors from Friday to Monday morning, Erwin v. Hamilton, 50 How.Pr. 32 (N.Y.1875); by threatening to deprive the jurors of food from Saturday to Monday, Cole v. Swan, 4 Green 32 (Iowa 1853); and by threatening to deprive a jury in the dead of winter of water and heat while they continued to deliberate, Mead v. City of Richland Center, 237 Wis. 537, 297 N.W. 419 (1941).

The more subtle technique, however, was soon found to be the giving of supplemental instructions, which exhorted the jury to arrive at a verdict. Supplemental instructions were said to be in "familiar practice" and their use was approved by the Supreme Court in 1894. Allis v. United States, 1894, 155 U.S. 117, 123, 15 S.Ct. 36, 39 L.Ed. 91, 94. It was two years later, however, when the Supreme Court expounded the case that was to become the wellspring from which all future judges would draw the solution to jury deadlocks.

In the October Term of 1896, the Supreme Court had before it the case of Allen v. United States. Alexander Allen was a fourteen year old "colored boy" who had been convicted of the murder of another youth in the Cherokee Nation. This was not the first time his case had reached the highest court in the land. He had been convicted of the murder in 1892, but the Supreme Court reversed that conviction due to a faulty jury instruction concerning justification or excuse for homicide. 1893, 150 U.S. 551, 14 S.Ct. 196, 37 L.Ed. 1179. Allen was again tried and was again convicted, but once more the Supreme Court overturned his conviction, this time because of a defect in the jury instruction regarding self-defense. 1894, 157 U.S. 675, 15 S.Ct. 720, 39 L.Ed. 854.

Alexander Allen was tried and convicted yet a third time. Again his case worked its way to the Supreme Court. When this third decision was handed down, the following terse sentence headed the Court's opinion: "No counsel for plaintiff in error [Alexander Allen]." Even more perplexingly, the opening paragraph of the Court's opinion began,

"We are somewhat embarrassed in the consideration of this case by the voluminousness of the charge, and of the exceptions taken thereto, as well as by the *absence of a brief* on the part of the plaintiff in error . . . ."

---

15. Crabb, History of English Law 287 (1829), *cited in* Note, 31 U.Chi.L.Rev. 386 n. 1 (1964). The jurors were said to be "kept without meat, drink, fire, or candle, unless by permission of the judge, till they are all unanimously agreed." People v. Sheldon, 156 N.Y. 268, 50 N.E. 840, 842 (1898).

164 U.S. at 494, 17 S.Ct. at 154, 41 L.Ed. at 528 (emphasis added). The body of the opinion disposed of several legal points. After paraphrasing a supplemental instruction employed by the trial court, the Supreme Court ·added a one-paragraph statement treating the function of juries.[16] The Court then affirmed the conviction by analyzing the propriety of the original "Allen charge" as follows:

"There was no error in these instructions."

164 U.S. at 502, 17 S.Ct. at 157, 41 L.Ed. at 531.

The *Allen* case thus abounded with peculiarities and there is little wonder that many doubt whether the case would not be decided differently today. *See* Thaggard v. United States, *supra*, 354 F.2d at 739 (Coleman, J., specially concurring). But that it should have become the foundationstone of all modern law regarding deadlocked juries is perhaps the greatest anomaly of the *Allen* case.

By whatever label identified—the *Allen* charge, the dynamite charge, the third degree instruction, the shotgun instruction, or the nitroglycerin charge—the standard supplemental instruction has been well-received by the nation's trial court judges. The charge is used precisely because it works, because it can blast a verdict out of a jury otherwise unable to agree that a person is guilty. Indeed, the charge has been the subject of much scholarly writing [17] and the basis for many an appeal. Hundreds of cases treat the *Allen* charge on the appellate level, and hundreds more have doubtlessly seen it used at the trial level. Every Circuit seems at one time or another to have accepted and approved the use of the dynamite charge.

But it is the Fifth Circuit that seems to have had and that continues to have the most particularly troubled experience with *Allen.* Judge Wisdom does not exaggerate when he says,

"The Allen charge causes more trouble in the administration of justice than it is worth. Its time-saving merits in the district court are more than nullified by ·the complications it causes on appeal . . . . 'Like Banquo's ghost it will not remain at rest.' Justice Udall, dissenting in State v. Voeckell, 69 Ariz. 145, 210 P.2d 972 (1949). And in this Circuit the ghost seems especially restless."

Andrews v. United States, 5 Cir. 1962, 309 F.2d 127, 129 (Wisdom, J., dissenting).

This Court has repeatedly grappled with the faults of the *Allen* charge,[18] and although the cases are already legion,[19] the number in which we are faced with *Allen* seems to be ever on the increase. *See* Huffman v. United States, 5 Cir. 1962, 297 F.2d 754, 759 (Brown, C. J., dissenting). But the problems caused by *Allen* are not endemic to this Circuit alone. Indeed, the charge has caused so much difficulty that the American Bar

16. Both paragraphs are reproduced in note 5 *supra.*

17. Recent examples that are particularly useful include: Note, Deadlocked Juries and Dynamite: A Critical Look at the "Allen Charge," 31 U.Chi.L.Rev. 386 (1964); Note, 9 Houston L.Rev. 570 (1972); Comment, Instructing Deadlocked Juries: The Present Status of the Allen Charge, 3 Texas Tech.L.Rev. 313 (1972); Note, Due Process, Judicial Economy, and the Hung Jury: A Reexamination of the Allen Charge, 53 Va.L.Rev. 123 (1967); and Note, On Instructing Deadlocked Juries, 78 Yale L.J. 100 (1968).

18. *See, e. g.,* Huffman v. United States, 5 Cir. 1962, 297 F.2d 754, 755–759 (Brown, C. J., dissenting); Andrews v. United States, 5 Cir. 1962, 309 F.2d 127, 129–130 (Wisdom, J., dissenting); Green v. United States, 5 Cir. 1962, 309 F.2d 852 (*per* Wisdom,. J.); Walker v. United States, 5 Cir. 1965, 342 F.2d 22, 27–29 (Brown, C. J., dissenting); and Thaggard v. United States, 5 Cir. 1966, 354 F.2d 735, 739–740 (Coleman, J., specially concurring).

19. In their briefs on this appeal, counsel have directed our attention to twenty-seven *Allen* charge cases decided in this Circuit in the last decade alone, all of which have some relevance to the facts of just this one case.

Association now recommends that it be replaced.[20] The other Circuits and many of the states have refused to cling to *Allen* as steadfastly as has the Fifth Circuit.

(1) The District of Columbia Circuit has exercised its supervisory jurisdiction to abolish *Allen* and has replaced it with the ABA standard. *See* United States v. Thomas, 1971, 146 U.S.App.D.C. 101, 449 F.2d 1177, 1187 (en banc).

(2) The First Circuit has said that the dynamite charge "should be used with great caution, and only when absolutely necessary." United States v. Flannery, 1 Cir. 1971, 451 F.2d 880, 883. Although it did not require trial courts to employ the ABA standard, the First Circuit effectively ordered that if *Allen* charges are to be used, the *Allen* language must be precisely followed.

(3) The Second Circuit has such "grave doubts" about *Allen* that it has given notice that it will not tolerate the slightest deviation from the approved language; furthermore, the Court stated that it permitted *Allen* to stand only by "the barest margin." *See* United States v. Kenner, 2 Cir. 1965, 354 F.2d 780, 782–784.

(4) The Third Circuit has flatly abolished the dynamite charge. "Hereafter this court will not let a verdict stand which may have been influenced in any way by an *Allen* Charge." United States v. Fioravanti, 3 Cir. 1969, 412 F.2d 407, 420.

(5) The Fourth Circuit has for a decade refused to allow trial judges to depart in the least from the language of the *Allen* case itself. *See* United States v. Rogers, 4 Cir. 1961, 289 F.2d 433.

(6) The Sixth Circuit has reversed convictions where only the slightest addition to the original *Allen* charge was made. *See, e. g.,* United States v. Harris, 6 Cir. 1968, 391 F.2d 348, 355.

(7) The Seventh Circuit has abolished the *Allen* charge in favor of the ABA recommendation. United States v. Brown, 7 Cir. 1969, 411 F.2d 930; Brandom v. United States, 7 Cir. 1970, 431 F. 2d 1391.

(8) The Eighth Circuit allows only the unadulterated recitation of the Supreme Court's paraphrase of the trial court's charge in *Allen,*[21] and even reading the Supreme Court's "second paragraph" to the jury is prohibited. *See* Chicago & E. I. Ry. v. Sellars, 8 Cir. 1925, 5 F.2d 31.

(9) The Ninth Circuit allows a supplemental instruction that does not urge

---

20. American Bar Association, Standards Relating to Trial by Jury 145–46 (1968):
"§ 5.4 Length of Deliberations; deadlocked jury.
"(a) Before the jury retires for deliberation, the court may give an instruction which informs the jury:
(i) that in order to return a verdict, each juror must agree thereto;
(ii) that jurors have a duty to consult with one another and to deliberate with a view to reaching an agreement, if it can be done without violence to individual judgment;
(iii) that each juror must decide the case for himself, but only after an impartial consideration of the evidence with his fellow jurors;
(iv) that in the course of deliberations, a juror should not hestitate to reexamine his own views and change his opinion if convinced it is erroneous; and
(v) that no juror should surrender his honest conviction as to the weight or effect of the evidence solely because of the opinion of his fellow jurors, or for the mere purpose of returning a verdict.
"(b) If it appears to the court that the jury has been unable to agree, the court may require the jury to continue their deliberations and may give or repeat an instruction as provided in subsection (a). The court shall not require or threaten to require the jury to deliberate for an unreasonable length of time or for unreasonable intervals.
"(c) The jury may be discharged without having agreed upon a verdict if it appears that there is no reasonable probability of agreement."
The principal virtue of the ABA proposal is that it discourages supplemental instructions and eliminates the dangerous reference to the minority's owing deference to the majority.

21. *See* note 10 *supra.*

the minority to rethink their position, does not tell the jury they must reach a verdict, but that simply tells the jury to keep trying. *See* Walsh v. United States, 9 Cir. 1967, 371 F.2d 135.

(10) The Tenth Circuit "cautiously" approves *Allen*, but it finds reversible error when any departures are made from the approved instruction's language. *Compare* Burroughs v. United States, 10 Cir. 1966, 365 F.2d 431, *with* Thompson v. Allen, 10 Cir. 1956, 240 F.2d 266. *See also* Goff v. United States, 10 Cir. 1971, 446 F.2d 623.

States too have joined the abandonment of *Allen*. Arizona has abolished *Allen* in its entirety. State v. Thomas, 86 Ariz. 161, 342 P.2d 197 (1959). Montana has put *Allen* to rest. State v. Randall, 137 Mont. 534, 353 P.2d 1054 (1960). Kansas, Idaho, and Iowa disapprove of and discourage any use of the dynamite charge. *See, e. g.*, Eikmeier v. Bennett, 143 Kan. 888, 57 P.2d 87, 92 (1936); State v. Moon, 20 Idaho 202, 117 P. 757 (1911); and Middle States Util. Co. v. Incorporated Tel. Co., 222 Iowa 1275, 271 N.W. 180 (1937). Missouri allows only a "temperate and moderate" supplemental instruction. *See* State v. Bozarth, 361 S. W.2d 819, 826 (Mo.Sup.1962).

Although there "is small, if any, justification for its use," *see* Green v. United States, *supra*, 309 F.2d 852, at 854, the Fifth Circuit has thusfar retained *Allen*. Although the indisputable modern trend is to abandon *Allen*, the Fifth Circuit has thusfar retained it. Although the judges of this Court have many times expressed discontent with the charge,[22] the Fifth Circuit has thusfar retained it. Although the commentators uniformly criticize *Allen*,[23] the Fifth Circuit has thusfar retained it. Although we have the power under our supervisory jurisdiction to abolish *Allen*, to limit it, or to replace it with the ABA standard, the Fifth Circuit has thusfar retained *Allen*. Indeed, it almost seems that only in the Fifth Circuit are trial judges relatively

free to detonate the charge that explodes a verdict from deadlocked juries.

We entertain no doubts that taking any of these steps of reform would largely remove the possibility of prejudice that exists whenever supplemental instructions are given. In addition, reform would have the salutary effect of removing an overly fertile source of appeals. As a panel, however, we are not free to make that choice, for we can overrule Fifth Circuit cases only when we sit *en banc*.

We thus are required to affirm the instant conviction. In doing so, we commend counsel for their excellent briefing, which we have found to be very elucidating. We fully concur in the government's apparent desire to see this Circuit's law on *Allen* settled and clarified, and we agree with appellant when he argues in his brief:

> "This Circuit should once and for all set down either a definite instruction . . . or adopt the recommendation of the ABA. To continue to decide each case on the particular instruction given, when so many trial judges deviate from *Allen* is to continue to invite appeals and to continue to confuse trial judges and attorneys."

As a panel, we can but conclude with the words of the dissent in Walker v. United States, *supra*, 342 F.2d 22, at 28–29:

> "It was the Judges who first thought up the idea of the dynamite charge. It ought to be the Judges who put an end to it in a quick and not too decent a burial.
>
> "And in these rites, for the requiem I would take the words of Mr. Justice Clark speaking, not ex cathedra, but rather as Chairman of the Joint Committee for the Effective Administration of Justice delivered on the fiftieth annual meeting of the American Judicature Society August 14, 1963, in the report of that Joint Committee under the title 'Progress of Project

---

**22.** *See* note 18 *supra*.

**23.** *See* note 17 *supra*.

Effective Justice.' Reporting on the state and regional judge seminars, he first said:

> 'Our seminars do not attempt the transformation of the judge into a mechanical genius. We do not use Lee Loevinger's gadget "jurimetrics." Science may reach the moon but it will never reach the jury. It still takes more than "symbolic logic" to do that. It takes an effective counsel with a competent judge presiding.'

"The Justice then concluded:

> 'Nor do we circulate the "Allen charge" to the new judges as I used to do when heading up the criminal division in the Department of Justice. Allen is dead and we do not believe in dead law.' "

## VI. CONCLUSION

■ We deeply regret being compelled to affirm this conviction. We do so only because we are bound by precedent. *See* United States v. Hereden, 5 Cir. 1972, 464 F.2d 611. Were the choice ours alone to make, we would put an end to the *Allen* charge in a "quick and not too decent burial." It is our fervent hope that when appellant petitions this Court for rehearing *en banc* our learned and distinguished brethren will vote for en banc consideration. We would also hope that this Court will join the jurisdictions that have abolished this abusable relic. But whatever the outcome of such a hearing, the law cannot help but be vastly improved by our issuing a definitive statement regarding the further use of the dynamite charge.

Affirmed.

## APPENDIX

### FINDINGS OF FACT*

At approximately 3:30 o'clock P.M. on March 15, 1971, the defendant was first interviewed by law officers at Holly Springs, Mississippi regarding possible criminal charges. At that time, he was subjected to questioning by Chief Stringer and there was present Special Agent Rabideau of the FBI. Rabideau presented to the defendant the standard advice of rights forms, which the defendant read and signed. The defendant himself was a highway patrolman of some two years experience and had familiarity with the rights form, understood the nature and content of the Miranda warnings, having himself many times administered such advice to other ciitzens in the course of his patrol duties.

Having signed the advice of rights forms at this occasion, which was exhibit one in evidence—the defendant was then questioned regarding his gambling activities and his whereabouts. He undertook to give an account of his activities from the day of the bank robbery. He was not directly questioned about the bank robbery, but he himself wanted to have it understood that he did not want the bank robbery on his record. He brought it up. But there was a discussion generally about his activities and his associations and the fact that he had been spending large sums of money.

At the conclusion of this interview, the defendant executed a waiver of search form that was presented to him—in evidence as exhibit three—to allow a search to be made of his residence. He understood the reason for the form and was told and was aware of the fact that if this form was not executed then a search could not be made of his premises, consisting of his home at 340 Tchulahoma Street in Holly Springs. The officers went there, if my recollection serves me, in the company of the defendant and the initial search was made of the house.

Following that interview and search, the defendant left the company of these officers, was on his own and went out and—being notified that he was to report in Jackson the following day—started drinking some. He drank some alcoholic beverages, he drove around the

* Verbatim.

town, he got somewhat tight, according to his own testimony, ending up at a restaurant at Holly Springs drinking coffee. He was drinking coffee and in the process of sobering up when two patrolmen came in and took him to the police station lounge, where they continued efforts to sober him up. He was given more coffee, he was allowed to sleep several hours.

At 4 A.M., he was awakened according to plan and accompanied other officers to Pontotoc, where Chief Stringer was met. They went to Jackson, Mississippi, arriving there at approximately 9 o'clock in the morning. They had no definite appointment time-wise with the Commissioner, but they were there for the purpose of having Commissioner Crisler determine whether or not there was cause to suspend the defendant as a patrolman because of his violation of the regulations against gambling. The day before, being the first interview, the defendant had admitted gambling activity on his part extending over a period of some days and virtually conceded that he had violated the regulations.

At the headquarters office, he was interviewed by Mr. Snodgrass, a supervisory officer, in the company of Chief Stringer. This interview began approximately 11:10 in the morning, but it was not started until Mr. Snodgrass himself had read the rights form to the accused, who understood, who said that he was ready to talk. Snodgrass was conducting this interview as part of an administrative procedure leading to the likely suspension of this defendant, if grounds existed.

Snodgrass also knew that because of marked money and other circumstances that the defendant was a suspect in the bank robbery, and as a matter of precaution, he gave the advice in the Miranda warning to the defendant purely out of precautionary measures. Actually, during the course of the statement that followed, there was a reference, appearing on page seven, dealing with the bank robbery, in which the defendant brought up himself, without any direct questioning, this statement: "On the night of March 15, I was off duty and out of uniform. I was concerned because those officers investigating the bank robbery at Byhalia seemed to think that I had something to do with that robbery and they indicated that three of the twenty-dollar bills taken in the robbery had been traced to me." A question and answer statement was taken of the defendant by Snodgrass and was signed by the defendant. This statement was then sent to the Commissioner, who read it and found it an adequate basis for suspending the defendant from the patrol for thirty days because of violation of the anti-gambling regulations.

At the time of this interview and during the course of the taking of it, Snodgrass exercised no coercion of any kind. There were no threats, there were no intimidations, there were no promises made to the defendant to induce him to talk. The Court rejects the defendant's version of what happened at the interview conducted by Mr. Snodgrass and finds as a fact that Snodgrass made no representations of help or assistance to the defendant if he made a statement implicating himself in the bank robbery.

On the other hand, after giving a statement to Mr. Snodgrass—exhibit four—the defendant himself voluntarily brought up in the conversation that some officers seemed to think he was involved in the bank robbery. This was a refrain of what the defendant had brought up in the conversation the day before, that is, he injected the bank robbery into the conversation. At that point, Snodgrass told the defendant that he was not interested in that matter, that he was concerned with carrying out his administrative review, but that if the defendant was involved in such a crime, he should think enough of the uniform that he wore to get it straightened out. There were no inducements, no statements of any kind it would be better for the defendant to make any statement of any kind regarding his implication.

After Commissioner Crisler told the defendant that he was suspended for an infraction of the anti-gambling regulations, the defendant was then dismissed, the mission was over and he came back in the highway patrol car to Holly Springs. There was no interrogation of him regarding either the gambling activities or the bank robbery or anything else on this return trip. In fact, there had been no discussion enroute to Jackson from Holly Springs regarding any of these matters. They went to Jackson for the purpose of the administrative procedure, the administrative procedure was conducted, a decision was made by the Commissioner, that concluded the object and purpose of their trip.

Arriving back at Holly Springs at approximately 6 o'clock P.M., Chief Stringer was under a duty to enforce the Commissioner's order to put the suspension into effect and the first step of that was to get the uniforms and equipment and the other official paraphernalia out of the possession of the defendant. It was for that purpose that several of the highway patrolmen went in one patrol car and Mr. Bailey, the defendant, and another patrolman went in a separate patrol car. No arrest had been made at that point, there had been no intention to make an arrest at that point. All of the men, including the defendant, arrived at the defendant's residence, where he got the uniform and the other equipment, it was checked off according to a list, it was turned over to the officers.

Now, at that point, the defendant had, at about 3:30 P.M. on the day before and at approximately 11 A.M. that day, been given the full Miranda warning rights, which he fully understood and appreciated. It is most significant that at each time the rights were given him he denied any connection with the bank robbery and sought to turn aside insinuations that other persons thought that he was connected with the bank robbery. At no time did he make any statement that incriminated him in the bank robbery.

Now, the defendant had a good friend attached to the highway patrol, Bryant House, a man with whom he had served since beginning his patrol job and upon whom he depended for fatherly advice. At approximately 7 o'clock P.M., Bryant House asked the defendant to get in the patrol car with him, telling him that he wanted to talk to him. The defendant agreed to ride with Bryant House, but this was not at all unusual, as it was customary for patrolmen to ride together in patrol cars.

Bryant House knew that damaging evidence had been obtained to implicate the defendant on the bank robbery charge, and he told him so. In fact, he told defendant he could expect to be arrested for it at any time. With that, the elderly man began crying with a burst of emotion because of his attachment to the defendant. Out of concern, House made the statement to Bailey that if he did rob the bank it would be better for him—the defendant—to plead guilty, that he could expect a lighter sentence from the court.

The defendant himself then became emotional, saying, in effect, he was ready to admit that he did it, and was ready to confess that he robbed the bank. At that moment, the defendant was not in custody, no arrest had been made by House or any other law officer, no order had gone out for the defendant's arrest. The defendant was still in company with a man that he well knew, worked with, riding in cars that he had familiarity with and going to the court house, a place he would frequent daily and regularly. When he went into the court house, it was not as one who had been arrested or in custody but as a person who wanted to make a statement to the law-enforcing officers and voluntarily give himself up. Upon reaching the court house, he saw first in the hall and later in the Sheriff's Office, the law officers to whom he then made the voluntary statement that he was the one who had robbed the bank and was ready to give himself up.

As soon as these local law officers heard this statement, they notified the FBI agent, who had left for his home at Oxford. The FBI agent, upon his return, went into the Sheriff's Office and asked the defendant if he wanted to talk, and the defendant said he did, and thereupon the agent gave him the rights form to be executed. The third rights form was executed by defendant at the court house—exhibit number five. Following the execution of that form, the defendant gave a factual statement to the FBI agent outlining his participation in the bank robbery and how it was accomplished. The statement was orally given to the FBI agent in the Sheriff's Office quite a little while before the writing was actually signed by the defendant.

When the defendant had come into the Sheriff's Office and made known that he was the bank robber, he also expressed a wish to talk to Giles Crisler, Commissioner of Public Safety, whom he had seen at Jackson earlier that day. Crisler was gotten on the line and asked Bailey if he wanted to give himself up to the patrol. Bailey said that he did. Then Crisler made special arrangements to fly to Holly Springs with an FBI agent from Jackson. Upon arrival, they talked briefly to the defendant and when he had done so he said he was ready to sign the statement.

At the time that he was talking to Patrolman House, the defendant was in possession of his mental faculties, he was responsive and he was quite aware of his rights and of the situation before him. He had been told that much evidence had been secured against him and that he was going to be arrested for the bank robbery. He weighed that fact. He had had on his mind the burden about committing the bank robbery, but up to that point had concealed it successfully. The defendant himself says in his testimony that his friend House did not make inducements or promises but simply was giving him fatherly advice, i. e. he could expect a lighter sentence if he pled guilty.

At the time the defendant returned to the court house and began voluntarily making impromptu statements to several officers concerning his guilt, he was undoubtedly in possession of his faculties. He had been crying, which had been brought on by communications with his wife and talked about their young children. Indeed, Bailey broke down and wept; he was emotionally upset as might well be expected under such circumstances, but his mind was not affected, his will was not overpowered.

Now, my conclusions of law are as follows:

## CONCLUSIONS OF LAW

First, that on the facts found by the Court and considering all of the circumstances in this case, which are indeed unique and unusual, the Court holds that there was an adequate and sufficient giving of the Miranda warning rights and that they did comply with the standards required by the law in order to put this defendant on notice that he was not required to give compulsory incriminatory statements. He knew that he was not required and he knew that he did not have to talk and he knew that if he started talking he could terminate it at any time, that he had the right to the assistance of an attorney. Now, he was schooled in the knowledge of those rights as much as a lawyer, indeed as much as a judge. So he knew intellectually that he had those rights and he understood what those rights meant for him in this situation.

As found by the facts, a Miranda warning was specifically given to him at 3:30 P.M. on the afternoon of March 15 and at approximately 11 o'clock A.M. on the morning of March 16. He understood them. The rights were not merely given to him as forms to sign, but they were complied with by the officers investigating these matters. There was no overreaching on the part of Stringer, Rabideau or Snodgrass in their questioning of the defendant. He was not coerced, intimidated or pressured in any way. When he talked, he talked freely

and voluntarily to those men. And later in the day, at approximately 9 o'clock P.M., when FBI Agent Rabideau returned to the court house at Holly Springs, before any interrogation of the defendant, he presented the rights form to the defendant, the defendant read it, understood it and signed it. And there was no overreaching of the defendant by Special Agent Rabideau or the other officers who might have been present in the court house at the time the written factual statement was prepared.

The unique situations presented by this evidence centers upon the legal significance to be accorded the conversation between Patrolman Bryant House and the defendant. The question is whether under all these circumstances the failure of Bryant House to give the Miranda warnings plus the affirmative statements that he made to the effect that it would be better on the defendant to plead guilty in that he would get a lighter sentence by so doing, whether that makes the ensuing confession, which was the first incriminatory statement, involuntary and coerced as a matter of law. The case seems to be one without any exact factual precedent.

The Court has no difficulty in holding, first, that under those circumstances the Miranda warnings did not have to be given by House for several reasons. First, he was not going to conduct an interrogation; secondly, the defendant was not arrested and was not in custody at that time. And, technically, the giving of the Miranda warnings as a condition precedent to talking to the defendant was not required.

That brings the Court to what it regards as the ultimate question in this case—whether the statements that Bryant House told the defendant and which House admitted on the stand making constituted enough to be psychological inducements that would invalidate the confession. That is, did he say enough to really overpower the defendant's mind, deprive him of his free will, and cause him to make involuntary statements?

The defendant himself on the stand said that House did not make any promises, did not promise him anything, but yet House did suggest to him that it might be to the defendant's benefit if he would plead guilty in that he would get a lighter sentence.

The Court holds that these cases cited by the Government, United States v. Ferrara, 2 Cir., 377 F.2d 16, and United States v. Frazier, 5 Cir., 434 F.2d 994, are very much in point. In the first place, the Frazier case is a Fifth Circuit opinion and it adopted the rule of the Ferrara case. The Frazier case is a 1970 decision. In Frazier, the court said that defendant's confession was not rendered involuntary by reason of the single fact that the FBI agents told him that if he cooperated with them his cooperation would be made known to the United States Attorney and that there might be some consideration given by the United States Attorney but that the agents could make no promises. Now, the Fifth Circuit said, "Standing alone this was not sufficient to establish that appellant's in-custody statement was involuntary," citing United States v. Ferrara.

In Ferrara, the testimony was that the confession was obtained only after an FBI agent admittedly told the accused, "If we cooperated with the United States Attorney, he felt sure that we could get out on reduced bail." The Court holds under the evidence that House made no promise of any kind to the defendant and therefore his statements did not partake of such nature as to make them inducements to the defendant.

Now, the defendant might at any time he saw fit decide freely to confess the crime, get it off his conscience, be unburdened to that extent. The Court concludes that that is what he did on this occasion when talking to his friend, Patrolman House, and that his statements were in no way induced by coercion of any kind, either direct and physical or indirect and psychological. The conclusion is reinforced by the fact that he was not under arrest at the time, there had

been no threat by House that he was going to arrest him.

The Court can conclude from these facts, indeed it must conclude beyond a reasonable doubt that this confession was free and voluntary. And its voluntariness has been proved beyond a reasonable doubt. When the defendant made these statements, his will was not broken nor was his intellect overpowered. At most, he was emotionally upset because of the implications to his wife and children as well as to himself, but he was not without either his will or his reason when he made these statements to House. This is also borne out by the fact that he followed through *involuntarily* and in an impromptu manner making other statements of guilt to officers whom he knew at the court house.

Considering all the facts, the Court holds that the motions to suppress the evidence are not well taken. The Court further holds that the evidence produced by the several searches made in this case were constitutionally and legally obtained on valid consent waivers. That will be the Order of the Court.

## ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

Before JOHN R. BROWN, Chief Judge, and WISDOM, GEWIN, BELL, THORNBERRY, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, DYER, SIMPSON, MORGAN, CLARK, INGRAHAM and RONEY, Circuit Judges.

BY THE COURT:

A member of the Court in active service having requested a poll on the application for rehearing en banc and a majority of the judges in active service having voted in favor of granting a rehearing en banc.

It is ordered that the cause shall be reheard by the Court en banc on briefs without oral argument. The Clerk shall set a briefing schedule for the filing of supplemental briefs.